J. MONROE HEISKELL *vs.* THE MAYOR AND CITY COUNCIL OF BALTIMORE.

*City Council of Baltimore—Rules of Procedure—Quorum— Municipal Corporation.*

In authorizing the City Council of Baltimore to "settle their rules of procedure," the Legislature did not confer on the Council the power to declare by rule what number of their body should constitute a quorum for the transaction of business.

In a municipal corporation, consisting of a definite number, in the absence of any Legislative declaration of what number shall constitute a quorum or legal body, a majority of the members elected shall constitute such quorum or legal body.

A mere majority of the members elected being present, the acts of the City Council of Baltimore are valid, notwithstanding the existence of a rule adopted by the Council requiring that two-thirds of the members elected shall be necessary to constitute a quorum.

A municipal corporation cannot by a rule made by itself, either enlarge or diminish its own powers.

APPEAL from the Superior Court of Baltimore City.

This case was submitted to the Court below, without the aid of a jury, upon an agreed statement of facts. The plaintiff was duly appointed as Fire Marshal of Baltimore City, on the 19th of February, 1883, under ordinance No. 1 of that year, and qualified. By the provisions of said ordinance his term of office was to continue for two years. Both Branches of the Council, elected in the fall of 1883, met, and after effecting permanent organizations, concurrently adopted rules "for the government of the ensuing session." Among these rules were section one of Rule 2, set out in the opinion of the Court, and the following:

RULE XV. No standing rule of the Branch shall be rescinded or changed, without the assent of three-fourths of the members of the Branch, and after one day's notice shall have been given; but any standing rule may be *suspended*, upon the assent of three-fourths of the members present, except Rule IX.

On the 5th of February, 1884, an ordinance was submitted in the First Branch, entitled an "Act to provide for re-organizing the Fire Department of Baltimore City." It provided for the repeal of ordinance No. 1 of 1883, under which the plaintiff was appointed Fire Marshal, and for the abolition of that office and the vesting of the control of the Fire Department in a "Board of Fire Commissioners of Baltimore City." It appears from the journal of the First Branch, that on the 12th of February, 1884, the repealing ordinance being under consideration, the Branch was left "without a quorum," and "the chair having directed a call of the members, and it appearing that only twelve members were present, (and this being less than a quorum,") the Branch adjourned until the next day. The proceedings, as they appear in the journal, upon the following days, were as follows:

February 13th. "It appearing on the roll-call that a quorum of members were not present," the Branch adjourned.

February 14th. "It appearing on the roll-call that a quorum of members were not present," the Branch adjourned.

February 16th. "It appearing that only twelve members answered the roll-call," the Branch adjourned.

February 18th and February 19th—similar entries.

On February 20th, eleven members being present, there is the following entry: "On the roll being called, a majority of the members of the Branch was declared to be present.". On motion of Dr. Street, (who, in making the motion, stated that he did so by authority of the 2d clause

of rule 15,) rule 2 was suspended. Mr. Counselman then offered the following resolution which was "declared adopted:" "Resolved by the First Branch of the City Council of Baltimore, that it is the sense of this Branch that, in the absence of any statutory provision on the subject, a majority of the members of the Branch constitutes a legal quorum for the transaction of business."

The repealing ordinance was, on the 25th of February, 1884, "declared passed" in the First Branch, twelve members being present. The ordinance came back from the Second Branch on the 10th of March, 1884, and in the First Branch, on that date, twelve members being present, the amendment was concurred in and the ordinance was "declared passed and the title approved." The ordinance was approved by the Mayor on the 24th of March, 1884. In the Second Branch, on the 25th of February, 1884, a resolution was adopted amending rule 3, "Convention Rules," to read as follows :

RULE III. Seventeen members shall constitute a quorum for the transaction of business, eleven of whom shall be members of the First Branch and six of the Second Branch, and a majority of all the members present shall be necessary to make or confirm an appointment. The rule, before amendment, required twenty-one members to form a quorum, fourteen from the First, and seven from the Second Branch. In the First Branch, on the 26th of February, 1884, only twelve members being present, this resolution was received from the Second Branch and "declared adopted."

Samuel Kirk, J. Alexander Preston and John F. Hunter were nominated by the Mayor to be Fire Commissioners under this ordinance and were confirmed as such by a joint convention of the City Council, held on the 31st of March, 1884, at which there were present but twelve members of the First Branch. These three gentlemen, on the 1st of April, 1884, demanded from the plaintiff the

transfer of the records of his office. This transfer the plaintiff declined to make, and notified the new Commissioners that he denied the legality of their appointment, and would continue to perform the duties of his office. On the 2nd of April, however, the plaintiff notified the three gentlemen named, that as the officers and men of the Fire Department had submitted themselves to their control, the further retention by him of the place of business, which he had been occupying in the City Hall, ceased to be necessary, and that, as its retention was of no importance to any legal steps which might be taken, he would not occupy the room after that date. The room was accordingly surrendered by the plaintiff to the three gentlemen named. The plaintiff, up to the time of bringing this suit, was ready and willing to discharge the duties of the office of Fire Marshal, and payment of any salary claimed by the plaintiff to be due him has been refused by the defendant since April 1st, 1884.

The suit was brought on the 7th of June, 1884, for two months' salary to the 1st of June, 1884, being $208.34 for each month. Besides the common counts, there was a special count that alleged that the plaintiff, under the provisions of the ordinance of the defendant, approved the 19th of February, 1883, was duly appointed Fire Marshal of Baltimore City for the term of two years, and as such duly qualified and entered upon the discharge of the duties of said office on the 19th day of February, 1883, whereby said plaintiff became entitled to receive from the defendant an annual salary of $2,500, payable monthly, and that there accrued and became due to the plaintiff his said salary for a period of two months to the 1st day of June, 1884, and that the defendant did not pay the same. To this special count the defendant pleaded specially the passage of the ordinance approved the 24th of March, 1884, and that said ordinance repealed the ordinance of the 19th of February, 1883, and abolished the office of

Marshal, from the date of the passage of the latter ordinance, and that the salary sued for was salary alleged to be due to him as Fire Marshal for a period subsequent to the abolition of his said office. To this plea the plaintiff replied that the ordinance of the 19th of February, 1883, was not repealed, and the office of Fire Marshal was not abolished by the alleged ordinance approved the 24th of March, 1884, and that the ordinance of the 19th of February, 1883, was in full force at the time of the institution of the suit. Issue having been joined, the case was submitted, and, by agreement, a *pro forma* judgment was rendered for defendant, with a right of appeal on the part of the plaintiff to the Court of Appeals. The plaintiff appealed.

*S. Teackle Wallis,* and *Thos. S. Baer,* for the appellant.

[Only those portions of the argument are reported which have reference to the points considered by the Court in its opinion.— REP.]

Assuming, for the purposes of the argument, that the action of the City Council, if legal, was in due form, the remaining question is whether the ordinance passed in March, 1884, was passed by a sufficient legal quorum of the First Branch.

It is not necessary to argue that, if a quorum was not present, all acts purporting to be the acts of the Branch were void. The quorum is, for such purposes, the Branch. 1 *Dillon Munc. Corp.,* 292, and cases cited.

By Rule 2, the Council certainly meant to make a quorum consist of fourteen members. This is the obvious and only rational construction of the words used. The existence of the Rule was expressly recognized by the President and members of the First Branch as soon as it was discovered that only twelve members were present, and the

journal for several days, in so many words, declares that "a quorum of members were not present." In fact, the existence and validity of the Rule were recognized by suspending it, and by claiming the right to do so under another rule, enacted in the same way, at the same time, and by the same authority. It is denied, however, that the Council had the power to pass any rule determining its own quorum, and that, by force of the common law, in the absence of any statute definitely fixing the number that shall constitute a quorum, a majority of any body consisting of a definite number, is and can be the only legal quorum of that body.

I. It is submitted, with great confidence, that no such common law rule exists in regard to municipal corporations. Indeed, the idea of connecting any common law rule whatever with the powers and procedure of corporations of that class, is at war with their whole theory and history. There can be no better established historical fact than that, down to the passage, in 1835, of the Municipal Corporations Reform Act (5th and 6th William IV, chap. 76), there were no municipal corporations existing in England in any way analogous to those of this country, or subject to any general common law rules. Even at this day, the analogy between the municipalities of the two countries is so imperfect, that the rules of one class can scarcely be considered as affording any fair illustration of those properly applicable to the other. The English municipal corporations prior to 1835 were established or grew up at different and remote times, under Act of Parliament, or royal charter, or long prescriptive usage. They formed no part of the common law system of the realm, but were an exception to it, and were governed by their own peculiar and widely differing rules, and not by any rules incident to, or derived from, the common law. In their present condition they have not existed long enough to have any common law of their own, and even if

they had, the Act of Parliament of 1835, under which and its amendments they chiefly exist, was passed so many years after our Revolution, that it is difficult to perceive how anything which concerns them can be regarded as of binding force or authority in this State. It is not necessary to enlarge upon this point, inasmuch as there is no respectable history of municipal corporations, in which the facts on which it rests will not be found fully set forth and illustrated. 1 *Dillon Munc. Corp.*, *secs.* 8, 32, 35, 36, *and notes*, 37*A*, 260, 278; 1 *Kyd on Corp.*, *chap.* 1, *and pp.* 400, 401, 422; see also *Railroad Co. vs. Dalby*, 19 *Ill.*, 353; *Bushnell vs. Ins. Co.*, 15 *Sargeant & Rawle*, 176, 177.

In saying that the municipal corporations of England were not regulated by common law rules, and that there was no common law applicable to them, it is of course not meant to be intimated that there were no municipal corporations, at common law, in England. On the contrary, many such corporations did exist, but they were only such as derived their existence and powers from immemorial usage, and the rules which governed them were diverse and special, and were part of the particular usage belonging to each particular case. They were in no sense a portion of the ordinary and universal common law system or derived from it. They were no part of the common law, in the sense in which it is adopted and applied by our Declaration of Rights. 1 *Dillon Munc. Corp.*, *sec.* 32.

Any relation, therefore, it is submitted, between the charter of the City of Baltimore and the common law of England is absolutely fanciful, without any historical fact or analogy to support it. It may consequently be granted, that no corporation has any inherent power to repeal or alter the common law, and yet be equally true that no American municipal corporation, deriving its powers exclusively from the law of its locality, is governed by rules or principles of the common law, which, even in England itself, had no application to bodies of that class. Mr. Dil-

lon (*vol.* 1, *sec.* 278), does not, for a moment, set up the doctrine that the common law rules as to the quorums and majorities of corporate bodies are in themselves authoritative in their application on American municipal corporations. On the contrary, he simply states, in a general way, that they have, "in general been applied." In *Cushing on the Law and Practice of Legislative Assemblies,* the highest American authority upon the whole subject under discussion, it is distinctly laid down (sec. 247), that the quorum of any legislative body may be determined by usage quite as well as by positive regulation. And even where the quorum is not determined by either, Cushing adds, not that the majority of the members will constitute a quorum, but merely that such a rule "is supposed." He shows (sec. 248 and notes) that, even in the British Parliament, the quorum of the House of Lords is only three, and that forty is a quorum of the Commons; both being regulated by and dependent upon usage. This anomaly applies equally to the prescriptive municipalities, which are the only class characterized as "common law corporations." I *Dillon, sec.* 32. In fact, the whole doctrine upon the subject is fairly stated in 1 *Dillon, section* 260, referred to in the brief of the appellee, in the following language: "In England, prior to the General Municipal Corporations Act of 1835, *the requisites of a valid corporate meeting* were dependent upon the Constitution of the particular corporation, under its charter or prescriptive usage." Unless they were regulated by such charter or usage, no rules of a common law character were incident to municipalities anterior to the period referred to.

II. There is no doubt that, under a common law rule applicable to private corporations, a majority of a corporate body which consists of a definite number, is competent to act as and for the body, in the first instance, in the absence of any statute or other superior regulation fixing the number that shall constitute a quorum. Such majority

remains competent to act, if the body itself takes no action fixing a different number. But this rule, the extent of which we shall examine presently, is applicable strictly to private corporations only. The text books and cases go no farther than to determine, as has been indicated already, that it has been, and may, under certain circumstances, be applied to municipalities, by analogy. But, in its application to the latter, it has none of the characteristics of those imperative common law rules or principles which are a part of the law of Maryland, and can only be derogated from by express authority of a statute. It is notoriously the law in England that the ordinances or by-laws, as they are called, of municipal corporations, unlike the enactments of legislative bodies generally, are subject to the revision and control of the Courts, and may be judicially annulled for unreasonableness, even where the matter is discretionary with the municipal Legislature. This Court, itself, in the case of *Radecke vs. The Mayor and City Council of Baltimore* (49 *Md.*, 229), recognized the existence of this principle, and applied it in a limited way. Its existence and extent in England show how little the rights and powers of municipal corporations there are regulated or governed like those of other corporate bodies, by the ordinary common law rules of right.

But it is a great mistake to suppose that, even as to private corporations, the rule of law in reference to the constitution of a quorum is such as is contended for by the appellee.

As any body, composed of a definite number of members, is not likely to be represented, at all of its meetings, by all of its members, it is of course necessary that some rule should be arrived at, by which the number shall be fixed, whose presence shall be considered as equivalent, in the beginning, to the presence of the whole. Naturally, all other things being equal, a majority of the whole number would be regarded, *prima facie*, as a proper acting

number. This is not, as is assumed in the argument on the other side, because of any superstitious or republican respect for the will of the majority, as such, but merely because a majority furnishes the most reasonable arbitrary measure of a quorum, when an arbitrary measure is rendered necessary by the absence of provisions controlling the subject. Whatever the principle may be, however, it is sufficiently carried out by giving to the majority the power of acting, at first, for the whole. Precisely the same principle would naturally give to the same majority the power to determine what number shall, at .any time thereafter, constitute a quorum. In fact, whenever any quorum, greater in number than the majority, is fixed by the majority, the rule fixing it is an expression of the will of the majority, and, in so far as there is anything sacred in such will, it .is fully obeyed. It does not follow, however, that, because a majority would appear to be the resonable and proper number for a quorum *in limine,* in the absence of any better, the continued existence of a quorum, composed merely of the majority, would best represent the majority doctrine or principle. On the contrary, the larger the number, in excess of a majority, which is required to constitute a quorum, the greater the probability that any measure passed upon will receive the nearest approximation to a majority vote. This may be illustrated in the case at bar. The First Branch of the City Council consists of twenty members, of whom eleven constitute a majority. As the majority of a quorum is competent to pass any measure, where such quorum is present, and six are a majority of eleven, it follows that, at any time, when a mere quorum is present, any measure, no matter how important, may be adopted by the vote of six out of the twenty members, or less than one-third. Placing the quorum, however, at fourteen, of which eight constitute a majority, it follows that no measure could pass except by a vote of eight out of the whole twenty, only

three less than a majority of the whole body. All, therefore, that has been said in disparagement of the original rule of the City Council, requiring two-thirds to constitute a quorum, on account of its supposed antagonism to the majority rule, is demonstrably without foundation. Instead of substituting the will of the minority for that of the majority, as is strangely argued, in the appellee's brief, the old rule really gave a larger scope to the will of the greater number. The new rule attempted to be sustained by the appellee, results, on the contrary, in placing the immense interests over which the City Council of Balmore has jurisdiction, in the hands of an insignificant minority.

This consideration has obviously operated upon the judgment of the English Courts in adopting the rule which they have applied to private corporations; and it will be found, upon examination, that all the cases referred to, as establishing the principle that a majority is a quorum, are cases in which a number less than the majority (and not more) has undertaken to act, without any ordinance or by-laws of the body itself, or any rule of superior authority, fixing a different number.

In the case of *Ex parte Wilcocks*, 7 *Cowen*, 402, it is expressly determined that the common law rule requires *not less* than a majority. And in section 278 of 1 *Dillon*, already referred to, this case is cited as an authority for the doctrine that, where the number which may form a quorum is determined by the common law, there must be *at least* a majority present.

In 1 *Kyd on Corporations*, 421, 422, the rule requiring a "major part" of the corporators as a quorum, is stated to be a restraint, and not an authority. That is to say, it is meant to restrain any less number than a minority from carrying on the business of a corporation, but is not intended to fix upon that number, in contradistinction to a larger number, as imperative upon the corporation, in

the absence of chartered or statutory authority to establish another. It determines that nothing less than a majority shall be a quorum. It does not determine that more than a majority shall not be. There is the highest authority, however, for the doctrine that the majority of the members present at a stockholders' meeting is a quorum, though a majority of the whole number be not present. *Morawetz on Corp., sec. 354, and notes.*

Even, therefore, if it be conceded, for the sake of the argument, that the City Council has no power to make less than a majority a quorum, it by no means follows that it exceeded its inherent right in requiring a majority to consist of two-thirds. Indeed it would seem that every intendment should be made by the Courts in favor of the original rule, in view of the dangerous facility with which, under the majority rule, so small a number of the actual members of the Council could control the passage of the most important ordinances, often involving pecuniary interests far larger than those which are dealt with by the Legislature of the State. While, as a general rule, it would not be decorous for Courts to assume that the members of any department of the government, whether State or municipal, would wilfully violate their duties or abuse their powers, there is no reason or comity which requires them to overlook the daily history of such bodies, or shut their eyes to the necessity of securing, in every possible way, and, if necessary, by the supervisory jurisdiction recognized in *Radecke's Case (supra)*, that prudent and deliberate legislation without which the most important interests may so readily be sacrificed. It is idle to say that the Courts are bound to be blind to the evils and abuses of municipal government in this country which everybody else sees. They have no right to presume that such abuses and such evils are unlikely to occur, when they are actually occurring, before the eyes of the people, every day, and are the subject of daily and hourly comment, not

only in the public press, but in the most serious political literature of our time. Indeed the wisest political thinkers and writers, both on this side of the water and the other, concur in regarding the governments of our great cities as the most serious problem with which our republican institutions have to deal. In the very case at bar, it is a notorious fact, and a part of the political history of the occasion, that the new rule of the City Council, in regard to its quorum, was passed expressly and confessedly with a view to mere political and personal legislation, and for the purpose of ousting the appellant from office, under color of changing the system and scheme of the Fire Department, of which he was Marshal. No abuse of our system can be more unworthy or pernicious than that of getting rid of obnoxious officers, who cannot be removed in the legitimate way, by repealing the legislation under which they are appointed to office. It has been applied to higher offices than the Fire Marshalship and will be if tolerated.

It is part of the admitted—certainly the undeniable—facts of this case, that the rule prescribing a quorum of two-thirds was adopted unanimously by the Branch. Every requirement of the majority rule, and every fair end which it contemplates, was thus fully met and served ; and if there was any violation of the republican doctrine upon that subject, it consisted in the act of a mere majority of one, who repealed what had been enacted by the unanimous Branch, and appropriated to themselves the power, which the vote of the entire Branch had limited to a quorum of two-thirds.

III.    There can hardly be any dispute that, in the absence of any legal provision to the contrary, the right to establish by-laws not in violation of the law or their charter, is inherent in and incident to all private corporations. *Kyd on Corp.*, 422 ; *Angell & Ames on Corp.*, sec. 349, et seq.; *Field on Corp.*, 294 ; *Buel vs. Buckingham*, 10 *Iowa*, 284.

There are few private corporations in the country which do not fix a quorum for themselves, under their power to make by-laws, whenever the number of a quorum is left undetermined by their charters. There is no reason why this analogy should not be extended to municipal corporations as well, if analogy in the other regards contended for is assumed to exist between them. In *Green's Brice's Ultra Vires*, (542, *note b*), various authorities are cited for the establishment of the proposition, that a majority of the directors is a quorum, only in the absence of provisions in the charter or by-laws; the right of the corporation to establish by-laws being conceded, in the absence of provisions in its charter.

IV. But, assuming that the City Council would not have the inherent power to regulate their quorum, it is submitted that the Legislature conferred that power, by authorizing the Council to " settle their rules of procedure." It is contended, upon the other side, that this language of the charter was never intended to confer upon the City Council the right to determine its quorum, because, in the very statute in which the language quoted was originally used, and its subsequent amendments, it was specifically provided what a quorum should be. But this does not, by any means, follow. It would seem more rational and logical to infer that the Legislature, having at first regulated the rule of procedure as to a quorum, by special enactment, afterward intended to relieve the Council from such statutory control, and therefore repealed the provision to such effect; leaving to the Council the power thereafter to settle their quorum with the rest of their matters of procedure. Certainly, if the Legislature had intended that a majority should constitute a quorum, they would have said so in words, as is said in the Constitution, as to the Senate and House of Delegates. They would never have been silent on the subject and have allowed their intention to be inferred, tacitly, from any supposed analogical

common law rule. They might possibly and reasonably have relied on the " American doctrine " that nothing less than a majority could constitute a quorum; but, if they meant•to exclude any quorum larger than a majority, it is only reasonable to suppose that they would not have left it to inference only. There is good reason for believing, from an inspection of the repealing Act of 1868, in connection with the preceding legislation, that it was never intended to re-enact the section, thereby repealed and re-enacted, with an omission of the provision in respect of a quorum. Indeed, it seems quite obvious that the omission was an accident, the law being plainly intended for other purposes. However this may be, it seems very difficult to realize that the regulation of a quorum is not a part of the procedure of a legislative body. It would appear, to the ordinary mind, that if any thing could be regarded really as part of procedure at all, it would be the regulation of the number without whose presence the body shall be precluded from proceeding. At the first meeting of the Council, as of any body, it might well be that no previous regulation of the quorum should be required. Indeed, in all cases where a corporate or legislative power has the right to determine its own quorum, it is very obvious that it must have the power to meet and act before its permanent quorum can be fixed. But a quorum being the representative of the body in case of the absence of the whole, and the number who shall thus represent the body being a matter absolutely essential to its proceeding in the discharge of its duties, it would seem that the power to regulate the number without which it could not proceed, would be the first thing in the mind of the legislator when conferring power to regulate procedure.

It is not contended, of course, that, by the power to settle its own rules of procedure, the Council was clothed with any authority to legislate in derogation of the law of the land, whether common law or statutory. The Legis-

lature, in conferring upon the Council the right to settle matters of procedure, did, itself, derogate from all existing law on the subject. It did not say that the Council should have the right to repeal or over-ride the existing law, but it did, itself, repeal the existing law, to the extent of saying that the procedure of the Council should no longer be governed by existing legislation, but should be subject to such regulations as the Council itself might adopt. There can be no question of the competency of the Legislature to give to any corporation, whether municipal or private, the right to fix the number which shall constitute a quorum of its body. There is, therefore, no question involved in the particular point under discussion, except the simple. one, whether to regulate a quorum is or is not to settle a rule of procedure in a legislative body. Does or does not the right to settle rules of procedure include the right to determine the number without whose presence the Council shall not proceed?

If settling a quorum is not establishing a rule of procedure, what is it?

It is submitted that, if the fixing of a quorum be not recognized as part of the "procedure," it can only be because it is excluded by an absolutely arbitrary definition. Any one thing inherent in the proceedings of a legislative body is as much a part of its procedure as any other; and there is no test, other than a purely arbitrary one, by which any distinction can be drawn between them, so as to bring one within the scope of the granted power and exclude the others from it.

*Bernard Carter, City Solicitor,* for the appellee.

A majority of the twenty members, of which the First Branch is composed by virtue of the provisions of the Constitution of Maryland, and the statute law of the State, is a *quorum* of that Branch.

The Act of Assembly of Maryland (*sec.* 13, *Article* 4, *of the Public Local Laws*), declares that the First Branch

shall consist of one member from each ward of the city, and as there are now twenty wards in the city, this Branch, by virtue of this provision of the statute law of the State, consists of twenty members.   The same statute law (*sec.* 14), declares that the Second Branch shall consist of one member from every two wards, and therefore, now consists of ten members.   It is a fundamental principle in our form of government, that the *majority*, and not the *minority*, shall rule.   In accordance with this principle, the Constitution of the United States, as to Congress, and the Constitution of Maryland, as to the Legislature, declares that " *a majority* of each House shall constitute a quorum." *Const. of Md., Art.* 3, *sec.* 20.

The common law of England, as applied to corporations, declares that in the absence of any special provision in the general *statute law*, or in the charter of any particular corporation, " the will of the *majority* shall," in the language of Chief Justice GIBSON, of the Supreme Court of Pennsylvania, " in all cases be taken as the will of the *whole.*"   7 *Serg. & R.*, 517.   And accordingly it was established, as a part of the common law, that whenever a body (as, for instance, the body of Common Councilmen) consisted by its charter of a definite number, a *majority* of that number constituted a *valid meeting*—that is to say, a *quorum*, and *as such* could transact any business which the *whole body* could transact.   2 *Kent's Com.*, 293 ; 5 *Dana's Abridgment*, 150 ; *Angell & Ames on Corpo.*, *secs.* 499, 501.   These common law principles are not only applicable by their very nature to Common Councils of municipal corporations, but have been *declared* to be applicable to them.   1 *Dillon on Mun. Corp., secs.* 260, 278.

It is established law in Maryland, that wherever the *statute law* of Maryland is silent, the *common law* is *a part* of the law of Maryland.   *Declaration of Rights, sec.* 5 ; *Wright vs. Wright*, 2 *Md.*, 452 ; *Hooper vs. Mayor, &c., of Balto.*, 12 *Md.*, 475; *Keech vs. B. & O. R. R. Co.*, 17 *Md.*, 45.

Though by the Act of 1817, ch. 168, sec. 2 (as codified in the Public Law of Maryland, Art. 4, sec. 10), the Legislature of Maryland, exercising its *sovereign* power over the municipal corporation of Baltimore City, made two-thirds of each Branch necessary to a quorum, this section, after having been repealed and re-enacted by the Act of 1865, ch. 176 (in the same terms, as far as this subject is concerned), was again repealed and re-enacted by the Act of 1868, ch. 451, and as thus re-enacted, it contains *no provision* whatever in reference to the number of the members of each Branch required to constitute a quorum, the provision requiring two-thirds of the number to constitute such quorum having been left out of the section 20, as thus re-enacted in 1868. It follows, therefore, that the number required to make a quorum remains as it was at *common law*, which number is, a *majority* only. As the common law operates to establish the law, in the absence of any statute of Maryland, just as efficiently as would a statute, we are to consider the charter of Baltimore City as if it contained an *express provision* that a majority shall constitute a quorum. It necessarily follows, therefore, that a majority constitutes a quorum, unless there is some statutory enactment in Maryland which authorizes the City Council to establish its own quorum.

That there is no such provision, seems too clear for doubt. It is true that sec. 23, of Art. 4, says the City Council shall "settle their rules of procedure." But *who* "shall settle their rules of procedure?" It is the two Branches of the City Council that are authorized to "settle their rules of procedure." Then, before the rules of procedure of the City Council can be settled, it must be determined *who are those who are to settle the rules of procedure.* Before a legislative body can have rules of *procedure,* that body must have an existence. Who are the constituent members of this body, must, therefore, be determined before the body can *proceed* to do anything. 1

*Dillon on Mun. Corp.*, sec. 259, *bracket page* [197], (*last clause*), *and sec.* 283.    And in 1 *Dillon on Mun. Corp., sec.* 288 (226), *it is said:*

"After a meeting of the Council is duly convened, the *mode of proceeding* is regulated by the charter, by ordinances passed for that purpose, and by general rules."

As the statute law of Maryland declares that the First Branch shall consist of twenty members, and the Second Branch of ten members, and does *not say* what number of these shall constitute a quorum, the common law comes in, and by its own operative force declares that a majority of each Branch constitutes a quorum, that is, constitutes the *Branch* for all legislative purposes, except for those particular purposes for which a large number is required by the statute law of Maryland.    Now it is well settled that as all the powers of the corporation are derived from the law and its charter, no ordinance or by-law, still less a *rule,* of the two Branches, or either of them, can *enlarge, diminish* or vary its powers. 1 *Dillon on Mun. Corp., sec.* 317 ; *State, relation of McClellan vs. Graves, et al.,* 19 *Md.*, 373.

As the common law, operative in the absence of statutory provision, declares that a majority of each Branch constitutes the *quorum*, that is, the "*Branch,*" to give to the provision of the statute, which authorizes these legislative bodies, *thus created,* power "to settle their rules of procedure," the *construction* that thereby the legislative branches were authorized to determine their quorum, that is, to determine *what they themselves consisted of,* is to say that because the legislative bodies were authorized to say *how their proceedings should be conducted,* they were thereby authorized to adopt a law for their *creation;* and for this purpose *change the common law of the land.*    There can be no escape from this conclusion, because we have seen that wherever rests the authority to determine the *quorum,* there of necessity rests the authority to determine what constitutes the *legal body,* as the *quorum* is the body

itself for all general legislative purposes.    2 *Kent Com.*, 293; *Cooley on Const. Lim., star page* 141.

Therefore, if the City Council can determine the *quorum* of its Branches, it can thereby not only change the common law, but determine what constitutes the City Council for nearly every legislative purpose.    That it cannot change a well-settled principle of the common law, unless the power to do so is conferred by statute in the *plainest terms,* is settled law.    1 *Dillon on Mun. Corp., sec.* 324; *Taylor vs. Griswold,* 2 *Green, N. J.,* 222.

In the language of the Supreme Court of the United States, " a power vested by legislation in a city corporation to make by-laws for its government, cannot be construed as imparting to it the power to repeal the laws in force or to supersede their operation by any of its ordinances. Nor can the presumption be indulged, that the ordinance passed by the city should be superior to or take the place of the general *law* of the State upon the same subject." *Thomas vs. Richmond,* 12 *Wall.,* 349.

A municipal by-law is thus defined by Baron PARKE: "It is a rule obligatory over a particular district, not being *at variance with the general laws of the realm,* and being reasonable and adapted to the purposes of the corporation." 19 *Law J.,* (*N. S.*) *Q. B.,* 135.

As the power to determine the *quorum* is the power to determine the *legislative body* itself, it is clear that if the City Council has the power to determine that a quorum shall consist of two-thirds, it has the power to determine that it shall consist of any less or greater number; therefore, it would have the power to determine that a quorum should consist of, say five members, or three members, or two members; and, therefore, a legal session of the First Branch of the City Council could be held with one-quarter or one-tenth of the whole number of members.

As showing how important is the matter of what number shall constitute a quorum, it may be noted that the

Constitution of the United States, and of every State in the Union, *deal with the subject*, not leaving it even to Congress, or to the State Legislatures, though the latter represent and embody the sovereignty of the States, to determine the question. Who can suppose that a matter of this importance was ever intended to be left to be settled by a rule of the Council of a municipal corporation, all of whose powers we know are of a *limited* nature? It may, therefore, be concluded that it is not in the power of the City Council to determine by its rules what shall constitute a quorum of the Branches, and all such rules are simply nugatory.

Nor do we consider that Rule 2, section 1, was ever intended to exercise the power to determine the quorum. The language is: "A quorum being present (two-thirds of the number *being* necessary,) the roll shall be called, &c."

The rules adopted by the present City Council are those which have been in force for a number of years past. The recital (in brackets) in the rule was, when originally passed, intended as a mere reminder or recital of the then existing statute law which required two-thirds for a quorum. It has evidently remained in the rule, *inadvertently*, ever since.

That it could never have been intended, when originally adopted to be the exercise of a supposed power to fix the number necessary to constitute a quorum, is demonstrated by the fact that when adopted, the *statute law* of the State fixed the quorum. Having been at that time only intended to be a recital of the statutory requirement, when that statute ceased to exist, it became simply nugatory.

STONE, J., delivered the opinion of the Court.

It appears from the agreed statement of facts, filed in this case, that the appellant, Heiskell, was in February,

1883, duly appointed Fire Marshal of Baltimore City, under an ordinance passed by the Mayor and City Council, and that he qualified as such Fire Marshal, and entered upon the duties of the office, and continued to discharge the same, until about the 1st of April, 1884.

That by an ordinance passed by the Council and approved by the Mayor in March, 1884, the ordinance passed in 1883 and above referred to, creating the office of Fire Marshal, was repealed, and a Board of Fire Commissioners created in its stead. That the Board of Fire Commissioners having been duly appointed, demanded possession of the office occupied by the Fire Marshal, but the appellant refused at first to deliver the office to said Board. But the officers and men, comprising the Fire Department, having submitted to the Fire Commissioners, the appellant surrendered the office to them under protest.

The appellant claims that the ordinance of 1883, under which he was appointed Fire Marshal for two years, was *not* repealed by the ordinance approved March, 1884, and that as he was ready and willing, and offered to perform the duties of Fire Marshal for the whole time of two years, for which he was appointed, he claims his salary for the balance of the term, or for some part of it.

It will be perceived from this statement, that the principal, and indeed we may say, the only question in this case, is whether the ordinance of 1883, creating the office of Fire Marshal was repealed by the ordinance of 1884, substituting a Board of Fire Commissioners for the Fire Marshal. If the ordinance of 1883, was *legally repealed* by the action of the Mayor and City Council in 1884, there is an end of the appellant's case.

The whole difficulty arises from the action of the *First Branch* of the City Council. If the repealing ordinance did not *legally pass* that Branch it was in fact no ordinance. If it did so pass that Branch, it is conceded that it is valid, as there is no dispute that it properly passed the Second Branch, and was approved by the Mayor.

The question, whether the repealing ordinance was passed by the First Branch, depends upon the force and effect of the *rules of procedure* adopted by the First Branch, and which were in force at the time of the passage of the repealing ordinance, or we may more properly say, of *one* of the rules of procedure.

That rule is as follows :

"If at the hour of meeting a quorum be not present, the absent members may be sent for, if required by a majority of those present, or an adjournment may be made to the following day ; but a quorum being present, (two-thirds of the members being necessary,) the roll shall be called by the clerk, commencing with the president, and proceeding with the members representing the wards in numerical order."

Waiving any objection that may be made to the wording of this rule, we will treat it as a rule duly made by the First Branch, at its first session, fixing and declaring that two-thirds of the members of that Branch should constitute a quorum for the transaction of business, and not a less number ; we may go a step further and take it for granted that when they passed that rule the members of that Branch supposed that they had the power to enact such a rule, and that they conceived that it was, until repealed, obligatory upon them, and the question then is squarely presented, "had the First Branch the legal right to determine what should constitute a quorum ?"

The appellee, a municipal corporation, was created by Act of the General Assembly. Of the power of the General Assembly to fix and determine what should be a quorum, there can be no possible doubt. This power the General Assembly has several times exercised. Thus in 1796 it provided that a quorum of the City Council should consist of three-fourths of the members; subsequently the Legislature fixed the quorum at two-thirds; but, finally, in 1868, in amending the law relating to the City Council,

nothing was said as to what should be a quorum, and so the law stood, at the time the repealing ordinance was passed.

But when the Legislature omitted. to exercise its undoubted prerogative, to declare what should constitute a quorum, it by no means intended to delegate that most important power to the Council itself. A municipal corporation is created for public and political purposes, and as to these corporations, Mr. Dillon says, "It is a general and undisputed proposition of law, that a municipal corporation possesses and can exercise the following powers, and *no others*: first, those granted in *express words*; second, those necessarily or fairly implied in, or incident to, the powers expressly granted; third, those essential to the declared objects and purposes of the corporation—not simply *convenient*, but indispensable. Any fair, reasonable doubt concerning the existence of power, is resolved by the Courts against the corporation, and the power is denied. They can exercise no powers but those which are conferred upon them, by the Act by which they are constituted, or such as are necessary to the exercise of their corporate powers, the performance of their corporate duties, and the accomplishment of the purposes of their association."

Now it has been urged, in behalf of the appellant, that the Legislature having granted to this municipal corporation the right, "to settle their rules of procedure," this power includes the right to fix the quorum.

"Rules of procedure" are rules made by any legislative body, as to the *mode and manner* of conducting the business of the body. They are intended for the orderly and proper disposition of the matters before it. Thus, what committees, and upon what subjects they shall be appointed; what shall be the daily *order* in which the business shall be taken up; in *what order* certain motions shall be received, and acted upon, and many other kindred

matters are proper subjects of the rules of procedure. These rules operate no where except in the legislative hall of the body that adopts them, and in this country, where, what is called in England standing orders, are almost unknown, expire at the end of the session.

But these rules of procedure never contravene the statute or common law of the land. When the Constitution of the United States gave to *each house* of Congress, and the Constitution of the State of Maryland to *each house* of the General Assembly, the right to determine its rules of proceeding, it was never held for a moment that such a right included the power to change any existing statute or common law; much less can a municipal corporation claim the right under the guise of permission to frame their rules of procedure, such unlimited power. This surely must be conceded by every one ; and being so conceded, the next question for us to consider is whether the right to fix a quorum, does contravene any existing law of the land.

As a general rule in this country the Constitutions of the several States fix upon what shall be a quorum in the legislative assemblies. So as a general rule, perhaps, the power that creates a municipal corporation fixes the number of the members that shall constitute the quorum. The quorum of a body may be defined to be that number of the body, which, when assembled in their proper place, will enable them to transact their proper business, or in other words that number that makes the lawful body, and gives them the power to pass a law or ordinance.

But when in the case, like the present, of a municipal corporation, the statute law creating it is silent, as to what shall constitute a legal assembly, the common law, both in England and in this country is well settled, that the *majority* of the members elect shall constitute the legal body. In *Blacket vs. Blizard*, 9 *B. & C.*, 851, the Court recognize the general rule of law prevailing in England, "that a

public trust committed to a definite number of persons should be executed at a meeting where a *majority* of that number is present." So in this country, Mr. Dillon states that, "The common law rules as to quorums and majorities established with reference to corporate bodies, consisting of a definite number of corporators, have in general been applied to the common council, or select governing bodies of our municipal corporations where the matter is not regulated by charter or statute." 1 *Dillon on Mun. Corp.*, 278.

Indeed the appellant concedes that in the absence of a statute fixing a quorum, a majority of any body consisting of a definite number, is necessary to constitute a quorum; but he insists that the majority, when so organized, may make *more* than a majority necessary to constitute a legal body.

But if we concede, as we must do, that where the charter is silent, the *common law* fixes the *majority* as the *legal body*, the case of the appellant is at an end. For the body itself to attempt to fix a greater number, is for the body to attempt to change a rule of the common law. It is tantamount to saying, that, although a majority of a City Council is a legal body, and has all the powers, and all the rights that the legislative and executive branches of the State government can give it, such majority can be shorn of its rights and powers and rendered powerless to act, by the action of one Branch. That would make *one part only* of a municipal corporation equal, in that respect at least, to the Legislature. But it is well established in this State, tha even a statute law (much less a rule of procedure) that seeks to alter a principle of the common law, must do so in plain and direct terms. "It is not to be presumed" (says this Court in 12 *Md.*, 475,) "that the Legislature intended to make any innovation upon the common law, further than the case absolutely required. The law rather infers that the Act did not intend to make

any alteration other than what is specified, and besides what has been *plainly pronounced.*"

And again, in *Day vs. Allender,* 22 *Md.,* 527, this Court quoting from *Dwarris on Statutes,* says, "A statute made in the affirmative, *without any negative expressed* or implied, does not take away the common law." Applying these rules of construction, it is clear that the amended charter of the city, when it omitted to fix the quorum, did not intend to change or alter in any way, the existing common law, that fixes the *majority* as the quorum. Again, if the First Branch of the City Council has the power to make the quorum greater than the common law makes it, that is to make it two-thirds, it follows, necessarily, that it would have the power to make it three-fourths, or declare that, before it should transact any business, *every member* must be present. Indeed, it seems to us, that if we concede to that Branch, the power to fix the quorum at a *greater* number than the majority, we must concede to it the power to fix it at less than a majority, and fix the legal body at one-third. But the books are full of cases deciding, that where the corporation consists of a definite number, and the charter is silent, less than a majority is powerless to act, and there is no case to the contrary except, perhaps, in some English cases, where the corporations claim, under *immemorial usage.* But such cases, says Mr. *Dillon,* 1 *vol.,* 324, are not applicable here.

The case in 16 *Iowa,* 284, to which we have been referred, throws no light on this subject. That was the case of a *private* corporation, and the provisions of the charter, are not given, but the fair inference from the whole case is that the three directors who passed the order therein mentioned, were in fact a majority of the board.

The City Council is the creature of the Legislature, and if it can exercise no powers not expressly granted to it, neither can it *deprive* itself by its own action of the powers that are granted to it. We have shown before, that a

*majority* of the Council constituted the legal body, and competent to do every act that the Council could do. It would be an anomaly indeed, if the Council itself could *deprive itself* of the right that it admittedly had. No municipal corporation can either enlarge or diminish its own powers. That is more than the Legislature of the State can do for itself. The latter derives all its powers from the Constitution, and the former all its powers from the Legislature. By the consent of the legal body, which is the majority, either may refrain from exercising any power it rightfully has, but that is all. But a majority, being the legal body, cannot delegate its rights and powers to a minority. Such would be the practical effect of this two-third rule. It would give to one more than a third of the whole number of councilmen elected, the power to prevent the passage of every ordinance, and thus entirely block the business of the Council.

It may be argued that the Legislature had done this. But the question before us is a question of power, not of expediency. The Legislature had the power to do that, and the only conclusion we can draw from their declension to exercise it, is that they deemed it inexpedient to make such a rule, not that they intended to delegate it to the Council.

We are therefore of opinion that the rule adopted by the First Branch of the City Council, was not a rule of procedure, but a rule affecting the legal rights and powers of the Branch, and which was entirely unauthorized by the charter, and therefore null and void; and that the ordinance of 1884, above cited (the repealing ordinance), was a valid ordinance, and the judgment below must be affirmed.

With this view of the case, it is unnecessary to advert to the other questions raised in the argument.

*Judgment affirmed.*

(Decided 9th March, 1886.)