CLEVELAND COTTON MILLS v. COMMISSIONERS OF CLEVE-
LAND COUNTY.

*Majority, When act of, Valid—County and County Commis-
sioners.*

1. If an act is to be done by an indefinite body, the law, resolution or
   ordinance authorizing it to be done is valid if passed by a majority
   of those present at a legal meeting; and when the act creating a
   corporation is silent on the subject, a majority of the officers or
   persons authorized to act constitute the legal body, and a majority
   of the members of the legally constituted body can exercise the
   powers delegated to the municipality.

2. The powers delegated to a county can, as a general rule, be exercised
   by the Board of County Commissioners, or in pursuance of a reso-
   lution adopted by them; but, where the action of the Commis-
   sioners, as in the matters specified in subsections 1, 8, 9, 10, 11, 17
   and 20 of section 117 of *The Code*, is subject to the "concurrence
   of a majority of the Justices of the Peace," or "the assent of a
   majority of the Justices of the Peace therein," the action of the
   Board must be approved at a meeting of the Justices convened
   according to law, a majority of the whole number in the county
   being present, by a majority of such majority constituting the
   organized body.

3. The words "majority of the members-elect," or "majority of the
   qualified voters," are used in constitutions and laws to take the
   exercise of a particular power out of the general rule, and make
   the assent of a majority of the whole number necessary.

4. Where the approval of the Justices is required, it must be given in a
   properly constituted meeting by them as an organized body. It
   is not sufficient to secure the assent of even a majority of the
   whole number manifested only by their signatures to a paper-
   writing.

5. The Commissioners are not required in any case to vote or participate
   in the meeting of the Justices.

6. The County Commissioners must, in all cases, exercise their own
   judgment first, just as though their action would be final, but
   they cannot give effect to such action, where the statute makes
   the approval of the Justices necessary, till the Justices ratify it.

7. The agreement by the Commissioners to pay each year a sum of money equal to the aggregate amount of plaintiff's tax for that year till the whole cost of the bridge should be discharged, was not an unlawful appropriation of the tax devoted by law to other purposes, but simply the means of ascertaining the amount of each annual installment.

CIVIL ACTION, tried at Fall Term, 1890, of the Superior Court of CLEVELAND County, before *Brown, J.*

The plaintiffs contracted in writing with the defendants to construct for the latter a bridge across First Broad River in the county of Cleveland, and the latter stipulated and promised to pay the former for the same the actual cost of the the bridge; the price was not otherwise specified. A majority of the Justices of the Peace of that county, not in session with the defendants at the time, signed a paper-writing in which they " do by our (their) signatures ratify and confirm and concur in the above contract, made on the 21st day of May, 1888, between the County Commissioners of Cleveland County and Cleveland Cotton Mills," etc.   In the contract it is stipulated that " the payments [are] to be made in annual installments in amounts equal to the tax on its (the plaintiff's) property in this county each year, until full payment shall be made."

Afterwards, at a regular joint meeting in June, 1890, of the Commissioners and Justices of the Peace, a quorum of the latter being present, the plaintiffs asked in writing that the Justices of the Peace " ratify and concur in the contract" mentioned above.   A motion in this joint meeting was made to that effect, which was adopted, twenty-three Justices of the Peace voting for and thirteen against it.   The defendants did not vote.

The plaintiffs complied fully on their part with the contract, and the defendants accepted the bridge, which cost $2,730.95.   A new road was established leading across this bridge, and it and the bridge have been constantly used by

the public, and there is no other way of crossing the river in the northern part of the county when the water is high.

The Board of Commissioners for 1888, after the completion and acceptance of the bridge, "made the first payment on said bridge, amounting to $185.21, an amount equal to the tax on plaintiffs' property in this county for that year." Between the time of this first payment and the time when, under the contract, the second payment to be made came due, a new Board of County Commissioners came into office, and, upon demand, they refused, and still refuse, to pay the second installment of the contract price due the plaintiffs, but, nevertheless, they exercise control over the new road which leads to and across the said bridge, and it and the road have been constantly used by the public as a highway, and the supervisors control the road.

This action is brought to recover the sum of money alleged to be due to the plaintiffs upon and by virtue of the said contract. The defendants contend that the contract sued upon is void and of no effect, because it was not made "with the concurrence of a majority of the Justices of the Peace" of the county, as required by the statute (*The Code*, § 707, par. 10); and further, that it is void because it undertakes to provide in advance that a part of the regular revenues of the county coming from the plaintiffs shall be devoted to a specified purpose, etc.

The Court gave judgment for the plaintiffs for the amount due, and the defendants, having excepted, appealed to this Court.

*Messrs. W. J. Montgomery* and *J. F. Schenck*, for plaintiffs.
*Messrs. J. B. Batchelor* and *Jno. Devereux, Jr.*, for defendants.

AVERY, J.: The Courts of this country have generally adopted the common law principle that, if an act is to be done by an indefinite body, the law, resolution or ordinance

authorizing it to be done is valid if passed by a majority of those present *at a legal meeting.* 1 Dillon, § 277 (215). Where the law creating a municipal corporation is silent on the subject, the majority of the officers or persons authorized to act constitute the legal body, and a majority of the members of the legally organized body can exercise the powers delegated to the municipality. 1 Dillon, § 278 (216); *Hieskell* v. *Baltimore,* 65 Md., 125; *Bomest* v. *Paterson,* 48 N. J. L., 395. The same rules apply to other bodies, whether the two houses of the Legislature or other organized bodies of officers or persons to whom the Legislature has given authority.

The powers delegated to a county can, as a general rule, be exercised only by the Board of County Commissioners or in pursuance of a resolution adopted by them. *The Code,* § 703. The Commissioners, organized and acting as a board are the embodiment of municipal authority. In their names the county must sue and be sued. The only limitations upon their exercise of the corporate functions of the municipality is to be found in subsections 1, 8, 9, 10, 11, 17 and 20 of section 707 of *The Code.* Subsection 10 provides, that where the cost of building or repairing a bridge shall exceed five hundred dollars, the commissioners can order the construction or repair only "*with the concurrence of a majority of the Justices of the Peace,*" as subsection 1 imposes the restriction that taxes shall not be levied by the board except "*with the concurrence of a majority of the Justices of the Peace sitting with them.*"

Before the Constitution of 1868 was adopted, the Justices of the Peace in the several counties exercised the powers delegated to the counties by the Legislature. The Justices of the Peace were the Judges of the Courts of Pleas and Quarter Sessions. For convenience the various statutes specified the particular number that must sit to discharge certain judicial duties or exercise police powers of different kinds. Rev. Code, ch. 31, § 1. "A majority, or twelve,"

were required to meet on the second and third days of the term of the County Court first held after the election to take the Sheriff's bond. Rev. Code, ch. 105, § 10. The Justices of the Peace, " *a majority being present,*" were required, at their first Court held after the 1st of January of every year, to levy a tax for county purposes. Rev. Code, ch. 28, § 1. The Justices being then the representatives of the county as a corporation and recognized by the law as a body, clothed with judicial authority and charged with administrative duties, it followed that powers delegated to them were to be exercised by a majority constituting a quorum according to the common law rule, unless some statute prescribed that a smaller number would be sufficient, or more than a majority would be required to discharge a specified official duty. After the constitutional amendments had been ratified and had taken effect (on January 1st, 1877), the Legislature, having entire control of county government, provided (*The Code*, § 716) that the Justices should meet biennially on the first Monday in June, and, a majority being present, "should proceed to elect not more than five nor less than three County Commissioners. The Commissioners can call the Justices of the Peace together not oftener than once in three months. *The Code*, § 717. The Justices are required, by section 719 of *The Code*, to fill vacancies occurring in the Board of Commissioners of a county. It is clear that, by implication of law, a majority of the majority of the whole number necessary to constitute a quorum may fill a vacancy in the Board of Commissioners and elect all of the Commissioners in the biennial meeting (" a majority being present ") by the express terms of the law in the same way.

In addition to the four instances already mentioned in which the Justices of the Peace of several counties are required to participate in their government, we find that it is provided in subsections 11 and 20 of section 707 that the Commissioners shall be clothed with authority to meet the

necessary expenses of the several counties, or to sell or lease
real estate belonging to the county, only with the "assent of
a majority of the Justices of the Peace therein." We think
it clear that the purpose of the General Assembly, according
to the ordinary meaning of the language employed by it,
was to require the concurrence of a majority of the whole
number constituting a quorum, to be expressed in the usual
way by a majority of those present, where the Justices should
ratify or express their approval of an order for the levying
of taxes for county purposes, or provide for constructing
bridges, involving an expenditure of more than five hun-
dred dollars, just as a majority (under chapter 28, sec. 1
Revised Code) levied the tax before 1868.

Under the system of county government, established by
the Constitution of 1868, the several Justices of the Peace
were made each a judicial officer, with a limited jurisdiction,
and those residing in each township were created a body
politic for certain purposes. But there were no powers exer-
cised by all the Justices of a county as a body, and conse-
quently no provision of law recognizing them as an organi-
zation. After the amendments had been ratified, the Legis-
lature of 1876–'77 provided (*The Code*, § 717) that they might
organize at their meeting, to be held not oftener than four
times a year, with the Register of Deeds as *ex officio* Clerk, and
in the absence of a specific requirement, empowered a major-
ity constituting a quorum to transact business. It seems
probable that the General Assembly did not propose, origi-
nally, to recognize the Justices in their organized capacity,
except for the seven purposes mentioned, and, therefore, in
entrusting them with the supervisory power to ratify or annul
the action of the Commissioners in five out of seven, it was
deemed best to declare what number should be requisite for
each purpose, though the number prescribed might amount
to an affirmance of the common law rule.

It must be remembered that, unless a contrary intent is apparent from the words of the statute, in each case a majority of the organized body is to constitute a quorum and express their will in the usual way. We must also note the fact that the powers to levy the taxes to build costly bridges and to erect houses of correction are exercised by the Commissioners, subject to "the concurrence of a majority of the Justices of the Peace," while the authority to borrow money to meet the necessary county expenses and to sell or lease the real estate of the county is made to depend upon the "assent of a majority of the Justices of the Peace *therein.*" The language used in these subsections is much more restricted than that employed in the Constitution, Art. 7, sec. 7. That section provides that "no county, city, town or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same, except for the necessary expenses thereof, *unless by a vote of the majority of the qualified voters therein.*" The language of the Constitution is very widely different from that used in any of the statutes defining the powers of Justices of the Peace to which we have referred. The constitutional inhibition is intended to prevent the creation of any such debts as those specified, not without the assent or concurrence of a majority (which may be expressed by an organization comprising a majority), but *unless by a vote* (actually cast) of a majority of the qualified voters therein." (in the county) in favor of creating it. We think that the words "by a vote of a majority of the qualified voters therein," as an entirety, cannot be interpreted as equivalent to "with the concurrence," or "with the assent of a majority," which can be manifested, just as each house of the General Assembly is in the habit of giving the assent of the body to a law by a majority of a quorum. Cooley's Const. Lim. marg., p. 141. Where the word "majority" is used in the statute to define a quorum, as in the subsections

cited, the concurrence of the majority is ascertained by the universal rule governing deliberative bodies.

Judge COOLEY says: "A simple majority of a quorum is sufficient, unless the Constitution establishes some other rule; and where, by the Constitution, a two-thirds or three-fourths vote is made essential to the passage of any particular class of bills, two-thirds or three-fourths of a quorum will be understood, unless the terms employed clearly indicate that this proportion of all the members, or of all those elected, is intended." The Constitution of Michigan provided that no act of incorporation should be passed by the Legislature unless with the assent of at least two-thirds of each house. The Supreme Court of that State held that, by the phrase mentioned, two-thirds of the legislative body, comprising a majority of the members elected and qualified, was meant. *Southworth* v. *Railroad Co.*, 2 Mich., 287.

The custom has been, where the framers of constitutions have meant a majority of the whole number, to indicate the intent to take the provision of the organic law out of the general rule of construction by using the words "a majority" (or two-thirds, as the case may be) of the members elected. Sedgwick Lim., 573. The Constitution of North Carolina, Art. 13, § 3, provides that no part of that instrument shall be altered "unless a bill to alter the same shall have been agreed to by three-fifths of each house of the General Assembly." This clause received a legislative construction from the House of Representatives when an amendment was passed by the votes of sixty out of one hundred present, and out of an aggregate membership of one hundred and twenty. House Journal 1887, pp. 530 and 707. When a case involving the construction of a similar clause in the Constitution of Missouri (*Harshmore* v. *Bates*, 92 U. S., 569) first came before the Supreme Court of the United States for interpretation, upon an analysis of the language ("unless two-thirds of the qualified voters of such city or town, at a

regular or special election to be held therein, shall assent thereto "), it was held to require the affirmative vote of two-thirds of all the registered voters, and not to mean two-thirds of those voting. In *County of Cass* v. *Johnston*, 95 U. S., 360, the Court overruled that decision, but Mr. Chief Justice WAITE, delivering the opinion of the Court, rested the ruling entirely upon the idea that the Courts of the United States must be governed by and conform to the construction given by the Supreme Court of Missouri to a similar statute enacted in pursuance of the same clause in the Constitution of that State. Justice BRADLEY, in an able dissenting opinion, insisted that the clause in question had received no such judicial interpretation from the Court of Missouri, and that it was, in fact, analagous to another section of the Constitution of that State, which provided that no bill should be passed " unless by the consent of a majority of all the *members elected* to each branch of the General Assembly." In the absence of such a provision in our own Constitution, the majority of a quorum, under the general rule, is deemed ,sufficient, and without the addition of the word " elected." Article 13, sec. 2, was interpreted, as we have seen, to require the affirmative vote of three-fifths of the whole (being for the particular purpose a quorum) that actually voted. In *Duke* v. *Brown*, 96 N. C., 130, Chief Justice SMITH adverts to the conflicting rulings in construing even such strong language as that used in the Constitution of Missouri, and determining whether a requirement that a municipal debt could only be incurred by a vote of a majority of the voters, should be interpreted to mean a majority of the qualified voters or a majority of those voting. The ruling of the Court is made to depend, in part at least, " upon the difference in the terms used " in Article 7, sec. 7 of our Constitution from those employed in statutes and clauses of constitutions that have received judicial construction in other Courts. This Court had previously reached the conclusion, in a case decided at the same term

(*Southerland* v. *Goldsboro*, 96 N. C., 49), that registered voters only were qualified voters, and that no county, town or other municipal corporation could contract any debt, pledge its faith or loan its credit, except for necessary expenses, unless a majority of the registered vote of the municipality was actually cast in favor of creating the debt. *Riggsbee* v. *Durham*, 98 N. C., 81. If the language used in section 707 (10) of *The Code* had been "with the concurrence by their votes of a majority of the Justices of the Peace of the county who have been duly appointed and have qualified," it would have been analagous to that upon which the other cases turned, and would have necessitated the actual casting of an affirmative vote by a majority of all the Justices in the county who have qualified. This distinction is clearly drawn in the authorities cited, and in many others that might be added, and is fully sustained by "the reason of the thing." It may lend some additional weight to this view of the subject to add that a careful review of the statutes providing a system of county government under the Constitution adopted in 1835, as collated in the Revised Code, and a comparison of them with chapter 17 of *The Code*, will suggest the idea to any intelligent mind that the Legislature of 1876–'7 (in the exercise of the power given by the constitutional amendment to provide for the government of counties) was attempting to engraft some features of the old system upon the new, by giving to the Justices of the Peace, a majority being present and constituting a quorum, just as under the old regime, the power to supervise the levying of taxes, the creation of bonded debts, the sale of real estate belonging to the county, and the creation of large indebtedness, even, for the necessary expense of the county. The purpose evidently was, in all these cases, to return to ancient landmarks, and if the language were doubtful this apparent intent might come to our aid in interpreting it. But following the construction given to the same and similar phrases in our Courts, we find that

the legislative intent in enacting section 707 (10) is manifest from the terms of the statute. We adhere, too, to the ruling in *Southerland* v. *Goldsboro*, *Duke* v. *Brown* and *Rigsbee* v. *Durham*, *supra*, all of which are distinguished from that at Bar, in that the language employed in Article 7, sec. 7 of the Constitution is clearly susceptible of no other interpretation than that it is essential to the validity of the indebtedness that an actual majority of all of the registered voters within the corporate limits should cast their votes in favor of creating it. Wherever the words used are construed to require the affirmative support of a majority of all who are qualified to act, of course their assent must be manifested, not by remaining at home, but by actual participation in the effort to carry the measure. The distinction between this case and those cases mentioned depends, therefore, solely upon the construction of the language employed. It was not the purpose of this Court in *Duke* v. *Brown*, *supra*, to lay down a general rule subversive of the well established principle that a majority of a body, in the absence of some words clearly showing that a majority of all persons qualified to act as members of it was intended, is always interpreted to mean a majority of a quorum, and that a majority of the whole number authorized to participate is in law a quorum in the absence of a special statutory requirement to the contrary. We think that where the phrase used is "qualified voters," it should be construed just as the Courts have interpreted " members elect."

We attach no importance to the paper signed by an actual majority of the whole number of Justices of the Peace of the county. The action contemplated by the law was that of the Justices of the Peace in a lawfully constituted meeting as a body, as in cases where the validity of an agreement made by the governing officials of any other corporation is drawn in question. *Duke* v. *Markham*, 105 N. C., 131. It was not intended that the two bodies (the Board of County Commis-

sioners and the Justices of the county) should become merged and act jointly as one assemblage. In all of the cases mentioned where the Justices of the Peace are clothed with the supervisory power over the acts of the Commissioners, it seems to be contemplated by law that the Board should first exercise its judgment, just as if its action would be final, but should not give effect to such action till the Justices of the Peace, either at a regular meeting or at one called by the Commissioners according to law, should ratify and approve the order held in abeyance to await their consideration of its merits. The law (*The Code*, § 717) names the Register of Deeds as the secretary of these assemblages, but leaves the organization, beyond that, an open question. It would seem to be proper that, as an independent supervisory body, they should appoint their own chairman and await a report from the Board of Commissioners as to the preliminary action upon the matters that are subject to their approval. It is not necessary, taking the view of the subject which we have expressed, that we should discuss or decide the question whether, according to the admitted facts, the Justices of the Peace or the Board of Commissioners, or both, ratified or sanctioned the original contract by subsequent acts in such a way as to amount to a waiver of irregularities. We hold that the contract was approved by the Justices of the Peace sitting as an organized body in the manner required by the statute, and, therefore, the contract needed no further recognition to impart validity to it. The contract between the plaintiff and the Board of Commissioners involved no agreement to appropriate the tax collected to other purposes than those prescribed by law. Upon the principle *id certum est quod certum reddi potest*, the cost of the bridge to be paid by the county was to be ascertained by keeping and rendering a careful account of the expenditure made in constructing it, while the size of the installments was to be determined

108—44

by reference to the amount of tax levied on the property of the plaintiff in the county. If the county should pay a sum of money to the plaintiff, and the identical fund should be used the same day to satisfy the claim of the tax-collector, it would not amount to a misappropriation of the tax. There is no error. The judgment of the Court below is affirmed.

MERRIMON, C. J.—concurring in the judgment: The plain, express words of the statute (*The Code*, § 707, par. 10), and as well its obvious purpose, exclude and forbid the interpretation that the concurrence of a majority of a simple quorum, or of a majority of one of the whole number of the Justices of the Peace of the county, shall be sufficient to make valid a contract of the Board of Commissioners of the county for the construction or repair of a bridge or bridges that cost exceeding five hundred dollars. The words employed are "with the concurrence of a majority of the Justices of the Peace." These words are significant and important. They cannot be treated as mere surplusage and meaningless, as they must be, if a majority of a majority of one of the whole number is sufficient; because, if such words had not been employed, such majority would have been required and sufficient. In the absence of such words, and in the absence of all limiting words, a majority of a quorum, or a majority of a simple majority would be necessary when such concurrence might be required. Such is the rule in all deliberative bodies and judicial tribunals. Then what useful, effective purpose does the words cited of the statute serve?

That these words imply, and were intended to imply, the concurrence of a majority of the whole number of Justices of the Peace of the county further appears in this: the same statute (*The Code*, § 716) prescribes that the Justices of the Peace "shall assemble at the court-house of their respective counties, *and a majority being present* (at the time desig-

nated) shall proceed to the election of not less than three nor more than five persons, to be chosen from the body of the county, who shall be styled the Board of Commissioners for the county," etc. Here, in an important respect, it is plainly contemplated that a majority of a bare majority may elect. Why were the words "a majority of the Justices of the Peace concurring," or like pertinent words, omitted in this connection, and employed in other important connections in the same statute? It is further provided, in paragraph fourteen, that "the action of the board in creating or altering townships shall not be operative until approved *by the Justices of the Peace* at a regular meeting." Why were these words, "a majority of the Justices of the Peace concurring," etc., omitted in this connection?

The Legislature was clearly advertent to distinctions and differences made as to the voice of the Justices of the Peace. It cannot reasonably be said that it incautiously and carelessly made such difference with no practical purpose in view.

The same statute (*The Code*, § 717) further prescribes that " for the proper discharge of their duties, the Justices of the Peace shall meet annually with the Board of Commissioners on the first Monday in June, unless they shall be oftener convened by the Board of Commissioners, which is empowered to call together the Justices of the Peace not oftener than once in three months."

It is further prescribed (section 707, par. 1) that at such annual meeting, " the Board of Commissioners is authorized, with the *concurrence of a majority of the Justices of the Peace* sitting with them, to levy, in like manner with the State taxes, the necessary taxes for county purposes," etc. It is further provided, in paragraph nine of the same section, that "with the concurrence of a majority of the Justices of the Peace," the Commissioners may "erect and repair the necessary county buildings, and to raise by taxation the moneys there-

for," etc.  It is further prescribed, in paragraph eleven of the same section, that the Commissioners shall have power "to borrow money for the necessary expenses of the county, with the *assent* of a majority of the Justices of the Peace therein, and not otherwise, to provide for its payment."  In paragraph seventeen it is provided that, "with the concurrence of a majority of the Justices of the Peace," the "Commissioners may make provision for the erection in each county of a house of correction."  It will be, hence, observed that the "concurrence of a majority of the Justices of the Peace" is expressly required only whenever taxes are to be levied, debts are to be contracted, and obligations incurred in and by the counties.  In respect to other matters, whenever they are to co-operate with the Commissioners, it is only requisite that a majority of a bare majority shall concur. Thus it appears that the Legislature had a settled purpose to make distinctions and differences as indicated, the object being to secure the larger voice and more reliable judgment of the county authorities in the very important matters of levying taxes and creating county obligations to pay money. It was not intended that the County Commissioners and a simple majority of a bare majority of the Justices of the Peace should exercise such authority.  Such legislation was cautious and wise, and deemed a proper restraint upon the wild and reckless spirit of the times manifested in the creation of public debts.  It is very apparent that the Legislature had in view, and followed up, the spirit and purpose of the Constitution as expressed in Art. 7, sec. 7, which provides that "no county, city, town or other municipal corporation shall contract any debt, pledge its faith or loan its credit, nor shall any tax be levied or collected by any officers of the same, except for the necessary expenses thereof, unless by a vote of the majority of the qualified voters therein."  The statutory provisions above referred to requiring the concurrence or assent of a majority of the Justices

of the Peace simply, in effect, extended this wholesale pro-
vision of the Constitution to the levying of taxes and the
creation of debts for the "necessary expenses" of counties.
This purpose is obvious, and hence the words of the statute,
"the concurrence of a majority of the Justices of the Peace,"
should receive the same interpretation as the substantially
similar words, "by a vote of the majority of the qualified
voters therein," of the constitutional provision just cited.
The language of the two phraseologies, are in effect, the same,
except as to the difference in their application.   In the one,
the language material here is, "the majority of the qualified
voters"; in the other, it is the "majority of the Justices of
the Peace."   Can the reasonable mind see substantial differ-
ence?   The clause of the Constitution just cited has been
interpreted by this Court in numerous cases, and it is firmly
settled that the "majority of the qualified voters" required by
it is a majority of all the qualified voters of the county, city,
town or other municipal corporation.   *Southerland* v. *Golds-
boro*, 96 N. C., 49; *Duke* v. *Brown, ibid.,* 127; *McDowell* v.
*Construction Co., ibid.,* 514; *Wood* v. *Oxford,* 97 N. C., 227;
*Rigsbee* v. *Durham,* 98 N. C., 81 and 99, N. C., 341, and there
are other cases to the same effect.

As the words of the Constitution under consideration, and
the like words of the statute to be interpreted, are substan-
tially the same, and are used for and intended to serve and
subserve the same purpose, is it not reasonable, just and nec-
essary that they must and shall receive the like interpreta-
tion?   It is very difficult to see how any other conclusion
can be reached.   Hence the words to be interpreted of the
statute, "with the concurrence of a majority of the Justices
of the Peace," imply a majority of all the Justices of the
of the county.

I, nevertheless, concur in the judgment of affirmance,
because it was clearly within the power of the County Com-
missioners to contract for the construction of the bridge

mentioned, if it should cost no more than five hundred dollars, and they might contract for the same for a greater sum than that mentioned, " with the concurrence of a majority of the Justices of the Peace" of the county. The several statutory provisions pertinent [*The Code*, §§ 707 (10), 2014, 2035; Acts 1887, ch. 370], fairly interpreted, imply that the County ·Commissioners ordinarily contract on the part of the county for the construction and repair of bridges, and if the construction or repair shall cost exceeding five hundred dollars, they must do so subject to the concurrence of a majority of the Justices of the Peace. It is not essential that such contract shall be made at a joint meeting of the County Commissioners and the Justices of the Peace, the party with whom they contract being present—it will be sufficient if such Commissioners contract inchoately with such party at one time, the contract to be afterwards concurred in by the Justices of the Peace at a joint meeting of themselves and the Commissioners. Until such concurrence, the contract would not be complete and binding—it would remain *in fieri*, open for the concurrence or non-concurrence of the Justices of the Peace. It would be very cumbersome and inconvenient for the contracting parties in such case to assemble together at a time and place prescribed by law, and agree upon the terms and details of the contract. It is not contemplated that they shall, but it is intended that the County Commissioners and the party contracted with may make the contract, subject to the simple concurrence of the Justices of the Peace. This is reasonable and practicable, and the statute so contemplates. If the party contracting to construct or repair the bridge should venture to construct or repair the same before such concurrence, he would do so at the hazard of his rights that might arise under the contract. Hence, the contract in question between the defendants and the plaintiffs was not void at the time the Justices of the Peace concurred in the same (if they did); it was until that.

time simply inchoate, and they might concur, or refuse to concur, with the defendants, and concurring with them rendered it complete and effectual. Hence, also, the argument for the defendants, that the contract was absolutely void and therefore could not be concurred in, is without force.

I am further of opinion that the Justices of the Peace did concur in the contract in question. After the bridge was constructed, and after it was accepted by the defendants, they paid the first installment of the price agreed to be paid for it. Regularly, under and in pursuance of the statute [*The Code*, § 707 (1)], a majority of the Justices of the Peace sitting with the defendants must have concurred in levying taxes to pay such installment paid, and thus they informally, but in effect, concurred in the contract for the construction of the bridge. In the absence of allegation and evidence to the contrary it must be taken that they did. A regular formal concurrence would be better and more satisfactory, but a concurrence in such joint meeting, appearing by presumption and reasonable implication, is sufficient if nothing to the contrary appears. It is not to be presumed that the Justices of the Peace at their regular joint meeting with the defendants on the first Monday in June, 1888, for the purpose of levying taxes for county purposes, including bridges, were ignorant of the bridge in question, and the county debt created on account of it, to pay part of which they presumedly made provision. On the contrary, the presumption is that they knew of it and concurred in the contract under which it arose, and hence concurred in the tax levy to pay part of it, and that, afterwards, the defendants, in the orderly course of their duties, paid that part. Otherwise they would not have made such payment. Such presumption arose from the record of the procedure and pertinent action of the Justices of the Peace in the joint meeting of themselves and the defendants. It had and has permanency and continues until, in some proper way, the contrary

shall be made to appear. The debt could not be properly and lawfully provided for or paid without such concurrence. The presumption further is, that such concurrence was by a majority of the Justices of the Peace, because the statute [*The Code,* § 707 (1)] requires that such majority shall concur in the tax levy.

CLARK, J.: I concur with the Chief Justice that a vote of a majority of all the Justices of the county is requisite, and that the vote of a majority of a quorum is not sufficient.

*Per Curiam.* Affirmed.