## ROCKINGHAM COUNTY v. LUTEN BRIDGE CO.

Circuit Court of Appeals, Fourth Circuit.
October 15, 1929.

No. 2873.

F. P. Hobgood, Jr., of Greensboro, N. C., and W. M. Hendren, of Winston-Salem, N. C., for appellant.

Edward S. Parker, Jr., of Greensboro, N. C. (Aubrey L. Brooks, of Greensboro, N. C., Julius C. Smith, of Robersonville, N. C., and C. R. Wharton, of Greensboro, N. C., on the brief), for appellee.

Before PARKER, Circuit Judge, and McCLINTIC and SOPER, District Judges.

PARKER, Circuit Judge. This was an action at law instituted in the court below by the Luten Bridge Company, as plaintiff, to recover of Rockingham county, North Carolina, an amount alleged to be due under a contract for the construction of a bridge. The county admits the execution and breach of the contract, but contends that notice of cancellation was given the bridge company before the erection of the bridge was commenced, and that it is liable only for the damages which the company would have sustained, if it had abandoned construction at that time. The judge below refused to strike out an answer filed by certain members of the board of commissioners of the county, admitting liability in accordance with the prayer of the complaint, allowed this pleading to be introduced in evidence as the answer of the county, excluded evidence offered by the county in support of its contentions as to notice of cancellation and damages, and instructed a verdict for plaintiff for the full amount of its claim. From judgment on this verdict the county has appealed.

The facts out of which the case arises, as shown by the affidavits and offers of proof appearing in the record, are as follows: On January 7, 1924, the board of commissioners of Rockingham county voted to award to plaintiff a contract for the construction of the bridge in controversy. Three of the five commissioners favored the awarding of the contract and two opposed it. Much feeling was engendered over the matter, with the result that on February 11, 1924, W. K. Pruitt, one of the commissioners who had voted in the affirmative, sent his resignation to the clerk of the superior court of the county. The clerk received this resignation on the same day, and immediately accepted same and noted his acceptance thereon. Later in the day, Pruitt called him over the telephone and stated that he wished to withdraw the resignation, and later sent him written no-

tice to the same effect. The clerk, however, paid no attention to the attempted withdrawal, and proceeded on the next day to appoint one W. W. Hampton as a member of the board to succeed him.

After his resignation, Pruitt attended no further meetings of the board, and did nothing further as a commissioner of the county. Likewise Pratt and McCollum, the other two members of the board who had voted with him in favor of the contract, attended no further meetings. Hampton, on the other hand, took the oath of office immediately upon his appointment and entered upon the discharge of the duties of a commissioner. He met regularly with the two remaining members of the board, Martin and Barber, in the courthouse at the county seat, and with them attended to all of the business of the county. Between the 12th of February and the first Monday in December following, these three attended, in all, 25 meetings of the board.

At one of these meetings, a regularly advertised called meeting held on February 21st, a resolution was unanimously adopted declaring that the contract for the building of the bridge was not legal and valid, and directing the clerk of the board to notify plaintiff that it refused to recognize same as a valid contract, and that plaintiff should proceed no further thereunder. This resolution also rescinded action of the board theretofore taken looking to the construction of a hard-surfaced road, in which the bridge was to be a mere connecting link. The clerk duly sent a certified copy of this resolution to plaintiff.

At the regular monthly meeting of the board on March 3d, a resolution was passed directing that plaintiff be notified that any work done on the bridge would be done by it at its own risk and hazard, that the board was of the opinion that the contract for the construction of the bridge was not valid and legal, and that, even if the board were mistaken as to this, it did not desire to construct the bridge, and would contest payment for same if constructed. A copy of this resolution was also sent to plaintiff. At the regular monthly meeting on April 7th, a resolution was passed, reciting that the board had been informed that one of its members was privately insisting that the bridge be constructed. It repudiated this action on the part of the member and gave notice that it would not be recognized. At the September meeting, a resolution was passed to the effect that the board would pay no bills presented by plaintiff or any one connected with the bridge. At the time of the passage of the first resolution, very little work toward the construction of the bridge had been done, it being estimated that the total cost of labor done and material on the ground was around $1,900; but, notwithstanding the repudiation of the contract by the county, the bridge company continued with the work of construction.

On November 24, 1924, plaintiff instituted this action against Rockingham county, and against Pruitt, Pratt, McCollum, Martin, and Barber, as constituting its board of commissioners. Complaint was filed, setting forth the execution of the contract and the doing of work by plaintiff thereunder, and alleging that for work done up until November 3, 1924, the county was indebted in the sum of $18,301.07. On November 27th, three days after the filing of the complaint, and only three days before the expiration of the term of office of the members of the old board of commissioners, Pruitt, Pratt, and McCollum met with an attorney at the county seat, and, without notice to or consultation with the other members of the board, so far as appears, had the attorney prepare for them an answer admitting the allegations of the complaint. This answer, which was filed in the cause on the following day, did not purport to be an answer of the county, or of its board of commissioners, but of the three commissioners named.

On December 1, 1924, the newly elected board of commissioners held its first meeting and employed attorneys to defend the action which had been instituted by plaintiff against the county. These attorneys immediately moved to strike out the answer which had been filed by Pruitt, Pratt, and McCollum, and entered into an agreement with opposing counsel that the county should have 30 days from the action of the court on the motion within which to file answer. The court denied the motion on June 2, 1927, and held the answer filed by Pruitt, Pratt, and McCollum to be the answer of the county. An order was then entered allowing the county until August 1st to file answer, pursuant to stipulation, within which time the answer of the county was filed. This answer denied that the contract sued on was legal or binding, and for a further defense set forth the resolutions of the commissioners with regard to the building of the bridge, to which we have referred, and their communication to plaintiff. A reply was filed to this, and the case finally came to trial.

At the trial, plaintiff, over the objection

of the county, was allowed to introduce in evidence the answer filed by Pruitt, Pratt, and McCollum, the contract was introduced, and proof was made of the value under the terms of the contract of the work done up to November 3, 1924. The county elicited on cross-examination proof as to the state of the work at the time of the passage of the resolutions to which we have referred. It then offered these resolutions in evidence, together with evidence as to the resignation of Pruitt, the acceptance of his resignation, and the appointment of Hampton; but all of this evidence was excluded, and the jury was instructed to return a verdict for plaintiff for the full amount of its claim. The county preserved exceptions to the rulings which were adverse to it, and contends that there was error on the part of the judge below in denying the motion to strike out the answer filed by Pruitt, Pratt, and McCollum; in allowing same to be introduced in evidence; in excluding the evidence offered of the resignation of Pruitt, the acceptance of his resignation, and the appointment of Hampton, and of the resolutions attempting to cancel the contract and the notices sent plaintiff pursuant thereto; and in directing a verdict for plaintiff in accordance with its claim.

As the county now admits the execution and validity of the contract, and the breach on its part, the ultimate question in the case is one as to the measure of plaintiff's recovery, and the exceptions must be considered with this in mind. Upon these exceptions, three principal questions arise for our consideration, viz.: (1) Whether the answer filed by Pruitt, Pratt, and McCollum was the answer of the county. If it was, the lower court properly refused to strike it out, and properly admitted it in evidence. (2) Whether, in the light of the evidence offered and excluded, the resolutions to which we have referred, and the notices sent pursuant thereto, are to be deemed action on the part of the county. If they are not, the county has nothing upon which to base its position as to minimizing damages, and the evidence offered was properly excluded. And (3) whether plaintiff, if the notices are to be deemed action by the county, can recover under the contract for work done after they were received, or is limited to the recovery of damages for breach of contract as of that date.

With regard to the first question the learned District Judge held that the answer of Pruitt, Pratt, and McCollum was the answer of the county, but we think that this holding was based upon an erroneous view of the law. It appears, without contradiction, not only that their answer purports to have been filed by them individually, and not in behalf of the county or of the board of commissioners, but also that it was not authorized by the board of commissioners, acting as a board at a meeting regularly held. It appears that Pruitt, Pratt, and McCollum merely met at the county seat to consider the filing of an answer to plaintiff's complaint. This was not a "regular" meeting of the board, held on the first Mondays of December and June. It was not a "special" meeting held on the first Monday in some other month. It was not shown to be a meeting "called" by the chairman upon the written request of a member of the board, and advertised at the courthouse door and in a newspaper as provided by statute. Consol. St. § 1296. And between the filing of the complaint and the filing of the answer there was not sufficient time for the advertising of a called meeting of the board. Consequently any action taken by Pruitt, Pratt, and McCollum with regard to filing an answer was not taken at a meeting of the board in legal session. Even if it be assumed that Pruitt continued to be a member of the board, and that he, Pratt, and McCollum constituted a majority thereof, nevertheless such majority could bind the county only by action taken at a meeting regularly held. The rule is well settled that the governing board of a county can act only as a body and when in legal session as such. 7 R. C. L. 941; 15 C. J. 460 and cases cited; O'Neal v. Wake County, 196 N. C. 184, 145 S. E. 28, 29; Grand Island & N. W. R. Co. v. Baker, 6 Wyo. 369, 45 P. 494, 34 L. R. A. 835, 71 Am. St. Rep. 926; Board of Com'rs of Jasper County v. Allman, 142 Ind. 573, 42 N. E. 206, 39 L. R. A. 58, 68; Campbell County v. Howard & Lee, 133 Va. 19, 112 S. E. 876; Paola, etc., R. Co. v. Anderson County Com'rs, 16 Kan. 302, 310. As said in the case last cited: " * * * Commissioners casually meeting have no power to act for the county. There must be a session of the 'board.' This single entity, the 'board,' alone can by its action bind the county. And it exists only when legally convened."

The North Carolina case of Cleveland Cotton-Mills v. Commissioners, 108 N. C. 678, 13 S. E. 271, 274, established the rule in North Carolina. That case arose under the old law, which required bridge contracts involving more than $500 to be made with the concurrence of a majority of the justices

of the peace of the county. Such a contract was made, and a majority of the justices of the county, who were not then in session, executed a written instrument approving it. Afterwards, at a regular meeting of the justices with the board of commissioners, a majority of the quorum of the justices present voted to ratify the contract. A divided court held that this ratification at the regular meeting was sufficient, although the majority of the quorum which voted for ratification was less than a majority of all of the justices of the county; but all of the members of the court agreed that the execution of the instrument by a majority of the justices when not in session was without effect. As to this, it was said in the majority opinion:

"We attach no importance to the paper signed by an actual majority of the whole number of justices of the peace of the county. The action contemplated by the law was that of the justices of the peace in a lawfully constituted meeting as a body, as in cases where the validity of an agreement made by the governing officials of any other corporation is drawn in question. Duke v. Markham, 105 N. C. 131, 10 S. E. 1017 [18 Am. St. Rep. 889]."

It will be seen that the court applied to this case, where the validity of the action of the governing officials of a public corporation was drawn in question, the rule laid down in Duke v. Markham, which is, of course, the well-settled rule in the case of private corporations, viz. that such officials can exercise their powers as members of the governing board only at a meeting regularly held. See, also, First National Bank v. Warlick, 125 N. C. 593, 34 S. E. 687; Everett v. Staton, 192 N. C. 216, 134 S. E. 492.

But in the case of O'Neal v. Wake County, supra, decided in 1928, the Supreme Court of North Carolina set at rest any doubt which may have existed in that state as to the question here involved. In holding that the county could not be held liable on a contract made at a joint meeting of the county commissioners, the county board of education, and a representative of the insurance department, the court said:

"A county makes its contracts through the agency of its board of commissioners; but to make a contract which shall be binding upon the county the board must act as a body convened in legal session, regular, adjourned, or special. A contract made by members composing the board when acting in their individual and not in their corporate capacity while assembled in a lawful meeting is not the contract of the county. As a rule authorized meetings are prerequisite to corporate action based upon deliberate conference and intelligent discussion of proposed measures. 7 R. C. L. 941; 15 C. J. 460; 43 C. J. 497; P. & F. R. Ry. Co. v. Com'rs of Anderson County, 16 Kan. 302; Kirkland v. State, 86 Fla. 84, 97 So. 502. The principle applies to corporations generally, and by the express terms of our statute, as stated above, every county is a corporate body."

We think, therefore, that Pruitt, Pratt, and McCollum, even if they constituted a majority of the board of commissioners, did not bind the county by their action in filing an answer admitting its liability, where no meeting of the board of commissioners was held according to law, and where, so far as appears, the other commissioners were not even notified of what was being attempted. It is unthinkable that the county should be held bound by such action, especially where the commissioners attempting to bind it had taken no part in its government for nearly 10 months, and where the answer filed did not defend it in any particular, but, on the contrary, asserted its liability. If, therefore, the answer be considered as an attempt to answer on behalf of the county, it must be stricken out, because not authorized by its governing board; if considered as the answer of Pruitt, Pratt, and McCollum individually, it must go out because, having been sued in their official capacity, they had no right to answer individually. And, of course, not having been authorized by the county, the answer was not admissible as evidence against it on the trial of the cause.

Coming to the second inquiry—i. e., whether the resolutions to which we have referred and the notices sent pursuant thereto are to be deemed the action of the county, and hence admissible in evidence on the question of damages—it is to be observed that, along with the evidence of the resolutions and notices, the county offered evidence to the effect that Pruitt's resignation had been accepted before he attempted to withdraw same, and that thereafter Hampton was appointed, took the oath of office, entered upon the discharge of the duties of the office, and with Martin and Barber transacted the business of the board of commissioners until the coming into office of the new board. We think that this evidence, if true, shows (1) that Hampton, upon his appointment and qualification, became a member of the board in place of Pruitt, and that he, Martin, and

Barber constituted a quorum for the transaction of its business; and (2) that, even if this were not true, Hampton was a de facto commissioner, and that his presence at meetings of the board with that of the other two commissioners was sufficient to constitute a quorum, so as to give validity to its proceedings.

The North Carolina statutes make no provision for resignations by members of the boards of county commissioners. A public officer, however, has at common law the right to resign his office, provided his resignation is accepted by the proper authority. Hoke v. Henderson, 15 N. C. 1, 25 Am. Dec. 677; U. S. v. Wright, Fed. Cas. No. 16,775; Rowe v. Tuck, 149 Ga. 88, 99 S. E. 303, 5 A. L. R. 113; Van Orsdall v. Hazard, 3 Hill (N. Y.) 243; Philadelphia v. Marcer, 8 Phila. (Pa.) 319; Gates v. Delaware County, 12 Iowa, 405; 22 R. C. L. 556, 557; note, 19 A. L. R. 39, and cases there cited. And, in the absence of statute regulating the matter, his resignation should be tendered to the tribunal or officer having power to appoint his successor. 22 R. C. L. 558; State v. Popejoy, 165 Ind. 177, 74 N. E. 994, 6 Ann. Cas. 687, and note; State ex rel. Conley v. Thompson, 100 W. Va. 253, 130 S. E. 456; State v. Huff, 172 Ind. 1, 87 N. E. 141, 139 Am. St. Rep. 355; State v. Augustine, 113 Mo. 21, 20 S. W. 651, 35 Am. St. Rep. 696. In the case last cited it is said:

"It is well-established law that, in the absence of express statutory enactment, the authority to accept the resignation of a public officer rests with the power to appoint a successor to fill the vacancy. The right to accept a resignation is said to be incidental to the power of appointment. 1 Dillon on Municipal Corporations (3d Ed.) § 224; Mechem on Public Offices, § 413; Van Orsdall v. Hazard, 3 Hill (N. Y.) 243; State v. Boecker, 56 Mo. 17."

In North Carolina, the officer having power to appoint the successor of a member of the board of county commissioners is the clerk of the superior court of the county. Consolidated Statutes of North Carolina, § 1294. It is clear, therefore, that, when Pruitt tendered his resignation to the clerk of the superior court, he tendered it to the proper authority.

The mere filing of the resignation with the clerk of the superior court did not of itself vacate the office of Pruitt, it was necessary that his resignation be accepted. Hoke v. Henderson, supra; Edwards v. U. S., 103 U. S. 471, 26 L. Ed. 314. But, after its acceptance, he had no power to withdraw it.

Mimmack v. U. S., 97 U. S. 426, 24 L. Ed. 1067; Murray v. State, 115 Tenn. 303, 89 S. W. 101, 5 Ann. Cas. 687, and note; State v. Augustine, supra; Gates v. Delaware County, supra; 22 R. C. L. 559. If, as the offer of proof seems to indicate, the resignation of Pruitt was accepted by the clerk prior to his attempt to withdraw it, the appointment of Hampton was unquestionably valid, and the latter, with Martin and Barber, constituted a quorum of the board of commissioners, with the result that action taken by them in meetings of the board regularly held was action by the county.

But, irrespective of the validity of Hampton's appointment, we think that he must be treated as a de facto officer, and that the action taken by him, Martin, and Barber in meetings regularly held is binding upon the county and upon those dealing with it. Hampton was appointed by the lawful appointing power. He took the oath of office and entered upon the discharge of the duties of a commissioner. The only government which the county had for a period of nearly 10 months was that which he and his associates, Martin and Barber, administered. If their action respecting this contract is to be ignored, then, for the same reason, their tax levy for the year must be treated as void, and the many transactions carried through at their 25 meetings, which were not attended by Pruitt, Pratt, or McCollum, must be set aside. This cannot be the law. It ought not be the law anywhere; it certainly is not the law in North Carolina. Section 3204 of the Consolidated Statutes provides:

"3204. *Persons admitted to office deemed to hold lawfully.* Any person who shall, by the proper authority, be admitted and sworn into any office, shall be held, deemed, and taken, by force of such admission, to be rightfully in such office until, by judicial sentence, upon a proper proceeding, he shall be ousted therefrom, or his admission thereto be, in due course of law, declared void."

In the case of State v. Lewis, 107 N. C. 967, 12 S. E. 457, 458, 13 S. E. 247, 11 L. R. A. 105, the court quotes with approval the widely accepted definition and classification of de facto officers by Chief Justice Butler in the case of State v. Carroll, 38 Conn. 449, 9 Am. Rep. 409, as follows:

"An officer de facto is one whose acts, though not those of a lawful officer, the law, upon principles of policy and justice, will hold valid so far as they involve the interests of the public and third persons, where the duties of the office were exercised— First, without a known appointment or elec-

tion, but under such circumstances of reputation or acquiescence as were calculated to induce people, without inquiry, to submit to or invoke his action, supposing him to be the officer he assumed to be; second, under color of a known and valid appointment or election, but where the officer failed to conform to some precedent requirement or condition, as to take an oath, give a bond, or the like; third, under color of a known election or appointment, void because there was a want of power in the electing or appointing body, or by reason of some defect or irregularity in its exercise, such ineligibility, want of power, or defect being unknown to the public; fourth, under color of an election or appointment by or pursuant to a public unconstitutional law before the same is adjudged to be such."

It is clear that, if the appointment of Hampton be considered invalid, the case falls under the third class in the above classification; for Hampton was discharging the duties of a county commissioner under color of a known appointment, the invalidity of which, if invalid, arose from a want of power or irregularity unknown to the public. Other North Carolina cases supporting this conclusion are Burke v. Elliott, 26 N. C. 355, 42 Am. Dec. 142; Burton v. Patton, 47 N. C. 124, 62 Am. Dec. 194; Norfleet v. Staton, 73 N. C. 546, 21 Am. Rep. 479; Markham v. Simpson, 175 N. C. 135, 95 S. E. 106; State v. Harden, 177 N. C. 580, 98 S. E. 782; 22 R. C. L. 596, 597. This is not a case like Baker v. Hobgood, 126 N. C. 149, 35 S. E. 253, where there were rival boards, both attempting to discharge the duties of office; for, upon the appointment of Hampton, Pruitt attended no further meetings and left him in the unchallenged possession of the office.

The rule is well settled in North Carolina, as it is elsewhere, that the acts of a de facto officer will be held valid in respect to the public whom he represents and to third persons with whom he deals officially, notwithstanding there was a want of power to appoint him in the person or body which professed to do so. Norfleet v. Staton, supra; Markham v. Simpson, supra; 22 R. C. L. 601, 602, and cases cited.

Coming, then, to the third question —i. e., as to the measure of plaintiff's recovery—we do not think that, after the county had given notice, while the contract was still executory, that it did not desire the bridge built and would not pay for it, plaintiff could proceed to build it and recover the contract price. It is true that the county had no right to rescind the contract, and the notice given

plaintiff amounted to a breach on its part; but, after plaintiff had received notice of the breach, it was its duty to do nothing to increase the damages flowing therefrom. If A enters into a binding contract to build a house for B, B, of course, has no right to rescind the contract without A's consent. But if, before the house is built, he decides that he does not want it, and notifies A to that effect, A has no right to proceed with the building and thus pile up damages. His remedy is to treat the contract as broken when he receives the notice, and sue for the recovery of such damages as he may have sustained from the breach, including any profit which he would have realized upon performance, as well as any other losses which may have resulted to him. In the case at bar, the county decided not to build the road of which the bridge was to be a part, and did not build it. The bridge, built in the midst of the forest, is of no value to the county because of this change of circumstances. When, therefore, the county gave notice to the plaintiff that it would not proceed with the project, plaintiff should have desisted from further work. It had no right thus to pile up damages by proceeding with the erection of a useless bridge.

The contrary view was expresesd by Lord Cockburn in Frost v. Knight, L. R. 7 Ex. 111, but, as pointed out by Prof. Williston (Williston on Contracts, vol. 3, p. 2347), it is not in harmony with the decisions in this country. The American rule and the reasons supporting it are well stated by Prof. Williston as follows:

"There is a line of cases running back to 1845 which holds that, after an absolute repudiation or refusal to perform by one party to a contract, the other party cannot continue to perform and recover damages based on full performance. This rule is only a particular application of the general rule of damages that a plaintiff cannot hold a defendant liable for damages which need not have been incurred; or, as it is often stated, the plaintiff must, so far as he can without loss to himself, mitigate the damages caused by the defendant's wrongful act. The application of this rule to the matter in question is obvious. If a man engages to have work done, and afterwards repudiates his contract before the work has been begun or when it has been only partially done, it is inflicting damage on the defendant without benefit to the plaintiff to allow the latter to insist on proceeding with the contract. The work may be useless to the defendant, and yet he would be forced to pay the full contract price. On

the other hand, the plaintiff is interested only in the profit he will make out of the contract. If he receives this it is equally advantageous for him to use his time otherwise."

The leading case on the subject in this country is the New York case of Clark v. Marsiglia, 1 Denio (N. Y.) 317, 43 Am. Dec. 670. In that case defendant had employed plaintiff to paint certain pictures for him, but countermanded the order before the work was finished. Plaintiff, however, went on and completed the work and sued for the contract price. In reversing a judgment for plaintiff, the court said:

"The plaintiff was allowed to recover as though there had been no countermand of the order; and in this the court erred. The defendant, by requiring the plaintiff to stop work upon the paintings, violated his contract, and thereby incurred a liability to pay such damages as the plaintiff should sustain. Such damages would include a recompense for the labor done and materials used, and such further sum in damages as might, upon legal principles, be assessed for the breach of the contract; but the plaintiff had. no right, by obstinately persisting in the work, to make the penalty upon the defendant greater than it would otherwise have been."

And the rule as established by the great weight of authority in America is summed up in the following statement in 6 R. C. L. 1029, which is quoted with approval by the Supreme Court of North Carolina in the recent case of Novelty Advertising Co. v. Farmers' Mut. Tobacco Warehouse Co., 186 N. C. 197, 119 S. E. 196, 198:

"While a contract is executory a party has the power to stop performance on the other side by an explicit direction to that effect, subjecting himself to such damages as will compensate the other party for being stopped in the performance on his part at that stage in the execution of the contract. The party thus forbidden cannot afterwards go on, and thereby increase the damages, and then recover such damages from the other party. The legal right of either party to violate, abandon, or renounce his contract, on the usual terms of compensation to the other for the damages which the law recognizes and allows, subject to the jurisdiction of equity to decree specific performance in proper cases, is universally recognized and acted upon."

This is in accord with the earlier North Carolina decision of Heiser v. Mears, 120 N. C. 443, 27 S. E. 117, in which it was held that, where a buyer countermands his order for goods to be manufactured for him under an executory contract, before the work is completed, .it is notice to the seller that he elects to rescind his contract and submit to the legal measure of damages, and that in such case the seller cannot complete the goods and recover the contract price. See, also, Kingman & Co. v. Western Mfg. Co. (C. C. A. 8th) 92 F. 486; Davis v. Bronson, 2 N. D. 300, 50 N. W. 836, 16 L. R. A. 655 and note, 33 Am. St. Rep. 783, and note; Richards v. Manitowoc & Northern Traction Co., 140 Wis. 85, 121 N. W. 837, 133 Am. St. Rep. 1063.

We have carefully considered the cases of Roehm v. Horst, 178 U. S. 1, 20 S. Ct. 780, 44 L. Ed. 953, Roller v. George H. Leonard & Co. (C. C. A. 4th) 229 F. 607, and McCoy v. Justices of Harnett County, 53 N. C. 272, upon which plaintiff relies; but we do not think that they are at all in point. Roehm v. Horst merely follows the rule of Hockster v. De La Tour, 2 El. & Bl. 678, to the effect that where one party to any executory contract refuses to perform in advance of the time fixed for performance, the other party, without waiting for the time of performance, may sue at once for damages occasioned by the breach. The same rule is followed in Roller v. Leonard. In McCoy v. Justices of Harnett County the decision was that mandamus to require the justices of a county to pay for a jail would be denied, where it appeared that the contractor in building same departed from the plans and specifications. In the opinions in all of these some language was used which lends support to plaintiff's position, but in none of them was the point involved which is involved here, viz. whether, in application of the rule which requires that the party to a contract who is not in default do nothing to aggravate the damages arising from breach, he should .not desist from performance of an executory contract for the erection of a structure when notified of the other party's repudiation, instead of piling up damages by proceeding with the work. As stated above, we think that reason and authority require that this question be answered in the affirmative. It follows that there was error in directing a verdict for plaintiff for the full amount of its claim. The measure of plaintiff's damage, upon its appearing that notice was duly given not to build the bridge, is an amount sufficient to compensate plaintiff for labor and materials expended and expense incurred in the part performance of the contract, prior to its repudiation, plus the profit which would have been realized if it had been carried out in accordance with its terms. See

Novelty Advertising Co. v. Farmers' Mut. Tobacco Warehouse Co., supra.

Our conclusion, on the whole case, is that there was error in failing to strike out the answer of Pruitt, Pratt, and McCollum, and in admitting same as evidence against the county, in excluding the testimony offered by the county to which we have referred, and in directing a verdict for plaintiff. The judgment below will accordingly be reversed, and the case remanded for a new trial.

Reversed.