## STATE EX REL. JOHN J. TODD v. WILLIAM W. ESSLING.

128 N. W. (2d) 307.

May 1, 1964—No. 39,199.

*John J. Todd,* pro se, and *C. L. Nelson,* for relator.
*Joseph P. Johnson* and *Thomas Malone,* for respondent.

ROGOSHESKE, JUSTICE.

On the petition of John J. Todd, this court issued a writ of quo warranto directing respondent, William W. Essling, to show the authority by which he claims the office of member of the Board of Tax Appeals. Relator requests us to declare him to be the true and lawful holder of said office.

The facts are undisputed. On April 3, 1961, the Honorable Robert J. Sheran was appointed and commissioned to be a member of the Board of Tax Appeals (hereinafter the board) for a term from April 3, 1961, until March 1, 1967. This appointment was confirmed by the senate on April 14, 1961. Mr. Sheran resigned from the board on October 1, 1962. Subsequently, on January 21, 1963, Governor Andersen appointed and commissioned respondent, William W. Essling, to the board for the remainder of the term of Mr. Sheran. On the same

date, the commission issued to respondent was recorded and attested by the secretary of state. On January 25, 1963, respondent executed and filed the oath of office and thereafter undertook his duties as member of the board.

On February 18, 1963, the 28th day of the 1963 legislative session, Governor Andersen, by letter, communicated respondent's appointment to the senate. Pursuant to the Permanent Rules of the Senate, this letter, denoted as a message from the governor, was referred to the Committee on Taxes and Tax Laws for investigation and report. The committee held a hearing on February 28, 1963, and voted to recommend to the senate that the appointment be confirmed. On March 1, 1963, the committee made a written report to the senate recommending that "the appointment be confirmed." On the same date, the Journal of the Senate, p. 513, records the following proceedings:

"Mr. Wright, from the Committee on Taxes and Tax Laws, to which was referred the following appointment: Member of the Board of Tax Appeals—William W. Essling, 1404 Lincoln Avenue St. Paul, Ramsey County, appointed effective January 21, 1963, for the term ending March 1, 1967.

"Reports the same back with the recommendation that the appointment be confirmed.

"Mr. Thuet objected to the foregoing Committee report and requested a roll call on the adoption of the report."

Mr. Wright moved a call of the senate. The roll being called, 61 senators from a total of 67 answered to their names. The journal then records the following:

"Mr. Wright moved that further proceedings under the Call of the Senate be dispensed with, and the Sergeant-at-Arms be instructed to bring in the absent members. Which motion prevailed.

"The question then recurred on the adoption of the Committee report pertaining to William W. Essling and the roll being called, there were yeas 40, and nays 21, * * *.

\* \* \* \* \*

"Which motion prevailed. Which committee report was adopted."[1]

There is no further reference to the confirmation of respondent in the Journal of the Senate for the 1963 session.

On July 19, 1963, after the close of the legislative session, the new governor, Karl F. Rolvaag, appointed relator, John J. Todd, to fill the vacancy created on the board by the resignation of Mr. Sheran. At the same time, Governor Rolvaag informed respondent that he considered his appointment ineffective and the office vacant. A commission was issued to relator on August 1, 1963, and he executed and filed the oath of office for the same position on the board to which respondent had been appointed by Governor Andersen.

This action was commenced on August 1, 1963. By mutual agreement, neither party has attempted to exercise the powers of said office until a determination of this controversy.

The determinative issue to be resolved is whether respondent's right to the office is superior to relator's. The issue is thus narrowed because of the facts. Relator's appointment by Governor Rolvaag clearly entitles him to the office if respondent has no right to retain it under his appointment and the senate action thereon. A determination of the issue requires that we first examine respondent's status following his appointment by former Governor Andersen.

The power of appointment is vested in the governor by virtue of our constitution.[2] The constitution is implemented by Minn. St. 271.01 as to the appointments of members of the Board of Tax Appeals. In so far as pertinent, this section provides:

"Subdivision 1. * * * The board shall consist of three members, each of whom shall be a citizen of the state, appointed by the governor, by and with the advice and consent of the senate. * * *

"Subd. 2. * * * [M]embers shall be appointed for terms of six years, respectively, commencing at the expiration of the preceding

---

[1] Journal of the Senate, March 1, 1963, pp. 513, 514.

[2] Minn. Const. art. 5, § 4, provides in part: "* * * He shall have power, by and with the advice and consent of the Senate, to appoint a state librarian and notaries public, and such other officers as may be provided by law."

terms. *Any vacancy shall be filled by the governor for the unexpired term, subject to confirmation by the senate. * * ** .

"Subd. 3. A member of the board may be removed by the governor only for cause, after written notice of the charges against him and an opportunity to be heard publicly thereon." (Italics supplied.)

The language of the statute makes clear that an appointment to fill a vacancy must be for a fixed term; that it is "subject to confirmation by the senate"; and that a member of the board so appointed cannot be removed during his term at the pleasure of the governor. Respondent contends that all of the requirements of the statute, including a confirmation of his appointment by the senate, have been met. Relator contends that respondent's appointment is incomplete because it has not been confirmed by the senate.

Apart from the requirement that respondent's appointment was "subject to confirmation by the senate," it is significant that he received a prior gubernatorial appointment, a commission was issued to him, he filed his oath of office and undertook the duties thereof, and his appointment was submitted to the senate for confirmation.

1. It appears well settled since Marbury v. Madison, 5 U. S. (1 Cranch) 137, 2 L. ed. 60, that with respect to an office having a fixed term where the appointee is not removable at will, when the executive power of appointment has been completely exercised, the authority of the executive to remove or rescind the appointment ceases.[3] This rule is founded upon the principle that where the appointing authority has done everything he is required to do to make a valid and complete appointment, he has fully exercised and exhausted his power

---

[3]McChesney v. Sampson, 232 Ky. 395, 23 S. W. (2d) 584; Barrett v. Duff, 114 Kan. 220, 217 P. 918; State ex rel. Griffith v. Matassarin, 114 Kan. 244, 217 P. 930; Alleman v. Dufresne (La. App.) 17 So. (2d) 70; State ex rel. Jewett v. Satti, 133 Conn. 687, 54 A. (2d) 272; People ex rel. Wetherbee v. Cazneau, 20 Cal. 504; People ex rel. Ryder v. Mizner, 7 Cal. 519; Tappy v. State (Fla.) 82 So. (2d) 161; Annotation, 89 A. L. R. 132, note V; Dawley, *The Governors' Constitutional Powers of Appointment and Removal*, 22 Minn. L. Rev. 451, 465. See, also, Watkins v. Watkins, 2 Md. 341.

over the appointee and a recall of the appointment would operate as a removal from office in violation of the appointee's right to continue in office subject only to a rejection by the senate or removal for cause.[4]

In support of his position, relator cites several cases in which it was held that the governor could make a new appointment when the senate had failed to confirm a previous appointee, e.g., Bell v. Sampson, 232 Ky. 376, 23 S. W. (2d) 575; Driscoll v. Hershberger, 172 Kan. 145, 238 P. (2d) 493. In the Bell case, Governor Fields in 1927 made several appointments to the State Textbook Commission. Thereafter, the senate met in the 1928 session but took no action on the appointments. In holding that Governor Sampson, the succeeding governor, was entitled to make new appointments, the Kentucky court said (232 Ky. 393, 23 S. W. [2d] 582):

"* * * [A]s a nonaction by the Senate is not a confirmation, it must follow, to give any effect to the statute at all and to carry out its manifest purpose, that, if appointments be not confirmed at the first session of the Senate following their making, they expire with the adjournment of the Senate, and while it may be true that, under the statutes which create their offices, the appointees may hold over until their successors are appointed and qualified, there is a vacancy which the Governor may fill."

The Bell case, however, involved a statutory requirement that the senate "shall take appropriate action upon such appointment *at its first session held thereafter,*" and the Driscoll case dealt with a similar re-

---

[4]Minn. Const. art. 13, § 2, provides: "The legislature of this state may provide for the removal of inferior officers from office, for malfeasance or nonfeasance in the performance of their duties." Minn. St. 271.01, subd. 3, provides that a member of the board may be removed only for cause after notice and hearing.

The power of the legislature to provide the manner for the removal of officers is exclusive. Sykes v. City of Minneapolis, 124 Minn. 73, 144 N. W. 453. Where a statute in this state creates an office to be filled by appointment for a fixed term, the right to remove at will is not incident to the power to appoint. State ex rel. Village of Chisholm v. Bergeron, 156 Minn. 276, 194 N. W. 624.

quirement. Clearly, senate nonaction under the facts of these cases had to be held to have the effect of a rejection.

It must also be noted that in cases where the appointment process is initiated by a nomination, with no power vesting in the appointee to exercise the functions of the office until confirmation, the rule laid down in the Marbury case has no application until the senate confirms and the appointing authority issues a commission to the officer. Such was the case under the applicable Federal appointive process in the Marbury case.

In McChesney v. Sampson, 232 Ky. 395, 23 S. W. (2d) 584, the rule was well stated and applied in disposing of an issue essentially similar to the one presented. In that case, the governor made an appointment to the State Textbook Commission after adjournment of the senate. Before the senate again convened and could act on the appointment, the same governor revoked the appointment and made a new one to the office. In holding that the governor could not revoke the first appointment, the court distinguished between two procedures for executive appointments. One procedure requires that there must be confirmation of a nomination before the officer can take office or exercise any of its functions. The other procedure permits an appointee to take office and assume its duties and responsibilities prior to confirmation. In regard to the former procedure, the court said (232 Ky. 401, 23 S. W. [2d] 587):

"* * * [T]he power of removal is not involved and nominations may be changed at the will of the executive until title to the office is vested."

In the latter procedure, the appointee—

"* * * holds then subject alone to the action of the Senate. His status is not that of a nominee awaiting confirmation, but that of an officer invested with the powers, privileges, and responsibilities of the position until the Senate acts. A recall of his designation would operate as a removal from office. It is argued that appointment to the office consists of two separate acts, one by the Governor and one by the Senate, and until both have acted there is no appointment such as to bring the in-

cumbant within the protection of the law. Even so, the two powers do not act concurrently, but consecutively, and action once taken and completed by the executive is not subject to reconsideration or recall."

In Barrett v. Duff, 114 Kan. 220, 217 P. 918, the court pointed out that a new power of appointment is not acquired by one succeeding to the governorship, and stated (114 Kan. 223, 217 P. 919):

"* * * The supreme executive power of the state is vested in the governor. * * * This executive power is continuous—never ending. It knows neither names nor persons. It began with the first governor, has continued ever since, and will continue unbroken so long as the constitution exists.

"It follows that, in respect to the offices in question, Governor Davis had the same power and no greater power of removal than that which would have been possessed by Governor Allen had he remained in office."

Likewise, Governor Rolvaag has the same power over the appointment—no greater or less—that Governor Andersen had before he left office.[5]

State ex rel. Griffith v. Matassarin, 114 Kan. 244, 217 P. 930, presents facts almost identical to the facts of the controversy before this court. There, Governor Allen made several recess appointments which the senate neither confirmed nor rejected. After the senate adjourned, Governor Davis attempted to revoke the appointments and make new ones. The court said (114 Kan. 250, 217 P. 932):

"* * * It appears that valid appointments were made, the journals do not show a rejection of appointees by the senate and no evidence, tending to show rejection, has been produced. * * * Assuming as we must that the appointments in question were neither confirmed nor rejected by the senate in the session of 1921, what is the effect of the commissions that were issued by the governor to the appointees after the senate adjourned without action appointing them for the full term and which did not expire until March, 1924? The appointments clothed

---

[5]Tappy v. State (Fla.) 82 So. (2d) 161; McChesney v. Sampson, 232 Ky. 395, 23 S. W. (2d) 584.

the appointees with all the powers and prerogatives of the offices for the terms named, subject only to be terminated by rejection of the senate, resignation, death or removal from office for cause * * *.

\* \* \* \* \*

"* * * As the senate did not act upon or reject the appointments made these officers had as good a title to their offices as the governor or other elected officers have to theirs. They were not appointed and commissioned to hold until the next session of the legislature but for the full term of three years and are entitled to hold out their terms unless the senate after consideration should vote to reject them or they should be ousted from office for misconduct. The attempted revocation of these appointments and the appointment of their successors must be held to be without effect. (Barrett v. Duff, supra.)"

It is apparent that the procedure contemplated by § 271.01 is an appointment to the board rather than a mere nomination by the governor. Under this statute, the governor's part of the appointive process is to appoint a person to the board, to issue him a commission, and to submit his name for confirmation to the senate. These acts constitute the full extent of the governor's powers in the appointive process. The senate has the right and power to confirm the appointment in order to fully complete the appointive process but, under the appointment procedures followed, this power to confirm actually is more in the nature of a power to veto the appointment after the fact. Neither confirmation by the senate nor further action by the governor was necessary to vest respondent with the powers and duties of the office. He actually performed those duties for several months and was empowered to do so until the senate directly, or indirectly, rejected his appointment or he was removed for cause.

The record before us clearly shows that the appointment of respondent by Governor Andersen was complete when reported to the senate and beyond his pleasure to revoke or rescind. It is equally clear that respondent's removal from office could not be effected except for cause unless his appointment was rejected by the senate, and, therefore, that his removal was beyond the pleasure of Governor Rolvaag. Since the record in no way shows that the appointment was rejected by the sen-

ate, we hold that respondent has a superior right to hold the office and the writ must be discharged.

2. Respondent not only contended that his right to the office is superior to relator's, but he vigorously argues that his appointment has been confirmed by the senate and, therefore, he has full title to the office. In view of our decision on the determinative issue, we need not pass upon this contention. However, we are in disagreement concerning this claim and, in view of this, we express our conclusion.

Respondent's claim must be disposed of by examining and interpreting the record of the proceedings in the senate as disclosed by its journal, as outlined above, the proceedings subsequent to the senate's receipt of notice of respondent's appointment by the governor terminated in the adoption of a report by the chairman of the standing Committee on Taxes and Tax Laws recommending confirmation. The significance of this action must necessarily be viewed in the light of what a member of the senate would understand occurred upon a reading of the journal. Under the rules of the senate, the journal is a record of the proceedings kept by its chief administrative or clerical officer, the secretary of the senate. By tradition and rule, it is a most abbreviated record.[6] The details of the proceedings are seldom reported, and it is essential, in order to understand what occurred, that the proceedings reported be read in conjunction with the rules governing proceedings before a legislative body.

Correctly viewed, the senate, in adopting the committee report over the objection voiced initially by one member, did no more than to receive the physical possession of the report from its committee and divest it of any further authority over the subject matter. This action was neither intended to be, nor did it amount to, a final approval of the committee recommendation. Because of the volume and complexity of legislative proposals, a legislature must conduct investigations and pro-

---

[6]See Jefferson's Manual of Parliamentary Practice (Rules and Manual, U. S. House of Representatives, 1963) § XLIX (§ 580, p. 277), by which the senate, under Rule 51, Permanent Rules of the Senate, is generally governed. See, also, Mason's Manual of Legislative Procedure, §§ 694, par. 2, and 696, par. 1.

vide for public hearings through committees. A committee, such as the standing Committee on Taxes and Tax Laws, is only an agency of the legislative body creating it and its function is usually to investigate and recommend. A legislative body cannot delegate its final power to a committee, and, except as especially authorized, the committee's acts have no force but remain subject to approval, modification, or rejection of the parent body.[7] Except in unusual instances requiring immediate action or where no member objects and the body operates on the basis of unanimous consent, all proposals, including appointments requiring advice and consent, are referred to a committee for investigation and recommendation.[8] Pursuant to well-established rules confirmed by custom and usage, reference of any proposal to a committee entails not only vesting the committee with power to investigate and recommend but also transferring physical custody of the writing embodying the proposal from the chief clerical officer of the parent body to the chairman of the committee.[9]

When the appointment of respondent was referred to a committee, the senate as a whole could not take action until the committee reported and returned the subject matter to the senate.[10] The committee, having met and investigated, resolved to recommend confirmation. A written report of this action was prepared and filed with the secretary of the senate for the purpose of reinvesting the body with possession of the subject matter, and thereupon permitting consideration of the appointment by the entire membership in the light of the contents of the committee's recommendation. When, under its rule pertaining to the order of business,[11] the item of receiving reports from standing committees was reached, the report was read to the senate. Although the

---

[7]Jefferson's Manual, § XI (§ 319, p. 140); Mason's Manual, §§ 51 and 615.

[8]Mason's Manual, § 378.

[9]Mason's Manual, §§ 611 and 621; Rule 48, Permanent Rules of the Senate. In the Minnesota Legislature, it is usual practice to keep a record of the transfer and possession of the writings referred to a committee.

[10]Jefferson's Manual, § XXVI (§ 411, p. 187) and § XXXIII (§ 437, p. 204); Mason's Manual, §§ 491 and 636.

[11]Rule 10, Permanent Rules of the Senate.

journal does not set out the details, the chairman of the committee then moved the adoption of the report. At this point, in legislative parlance, he was simply requesting the senate to acknowledge that the committee had performed its function and to accept a return of the subject matter for a consideration on the merits. The fact that a member objected and requested a roll call vote, which prompted the chairman of the committee to move "a call of the Senate,"[12] does not change the nature of the motion or enlarge the significance of the vote. The effect of favorable action on the motion, whether declared carried on a voice vote or a roll call vote, taken by those present or under a "call of the Senate" is the same;[13] namely, that the body accepts a return of the subject matter for consideration in the light of the committee's recommendation.

Interpreting the action taken by the senate as confirmation of the appointment, as respondent argues, involves making an erroneous assumption that the narrow question presented by the motion included also a consideration of whether or not respondent's appointment should be confirmed. We find no indication whatsoever in the journal that the merits of the appointment were either considered or debated, and such an assumption would be contrary to the practice followed in conformity with the senate's general rules.[14] The journal is silent as to why there

---

[12] A call of the senate is a procedure under its rules designed to insure that all members not excused will be sent for and be required to attend the session and vote. Rule 30, Permanent Rules of the Senate.

[13] While the practice may not be followed in the Minnesota Senate, it is not unusual in processing a motion to adopt a committee report (regarded as relatively unimportant in effect and rarely debated) for the presiding officer to suppose the consent of the body and, following the motion to adopt, not to put the question formally but simply to declare, "There being no objection, it is so ordered." Such is a common practice of the Minnesota House of Representatives which, unlike the senate, elects to be generally governed by Mason's Manual. See Jefferson's Manual, § XXXIX (§ 491, p. 236), where this procedure is authorized.

[14] Jefferson's Manual, § XXVII (§ 418, p. 193), indicates that as a general rule such reports are placed on the calendar, "there to await action under the rules for the order of business." Although Mason's Manual, § 685, does indicate that the use of the word adopt "has the effect of

was objection to the motion to adopt; hence, the assumption should not be made. It is equally plausible to assume that the opposition to the motion was based upon a claim that the committee's recommendation was arrived at without a complete investigation or before the public or interested parties were given adequate notice and opportunity to be heard; or that the objection was motivated by the minority who believed that the procedure was hasty and designed to insure that, if there was to be a change in governors, the incoming governor thereby could be precluded from appointing his choice to fill the particular office. Since it is now part of the history of this state that at the time the senate action took place the election contest between Governor Andersen (then in office) and Governor Rolvaag (who shortly thereafter succeeded him) was still unresolved, the latter surmise, if speculation were permitted, is more likely the reason for the objection to receiving the report.

Even the most inexperienced legislator understands that a motion to adopt a committee report is relatively insignificant in effect since it is neither designed nor intended to reach the merits of a committee recommendation. It is not at all infrequent that, in order to support the committee chairman and the integrity of proceeding by committees, members vote to adopt a committee report in the legislative sense even though they vigorously disagree with its recommendations, withholding their opposition until final action is taken. Moreover, assuming for the moment that the committee's action was to report the appointment back without recommendation, surely a vote to adopt the report could have no more effect or significance than to return the appointment to the senate for further action. To hold that the journal shows confirmation would be tantamount to holding that the adoption of a standing committee's report, in the legislative sense, would be not only an endorsement of the committee's recommended action but final action by the entire membership. While many members might agree and, by their vote, intend to endorse the committee action, none would intend that

endorsing" a report, § 676, par. 8, states it is a "serious error" to move to accept or adopt "when it is intended only to make the report available for consideration at a later date."

this constituted his final vote on the merits. Such a holding would do violence to the mechanics of well-recognized legislative procedures and would—contrary to the rules designed to afford every member an opportunity to be heard and to protect the minority from the excesses of the majority—advance the final consideration of every measure to the time when the committee or the committee chairman chose to make a report.

Tested by what a member would understand from reading the journal, the senate action upon the appointment was not complete after the adoption of the committee report. There remained, as required by the rules of the senate,[15] a delay of 1 day before it could be reached, and thereafter—when reached pursuant to the order of business and only after a member moved a consideration on the merits—a final vote on the question of "Will the Senate advise and consent to this nomination?" Customarily, final senate action is then communicated to the governor. No record of such communication exists in this case.

Although it certainly has been held that legislative rules are merely procedural and may be waived or disregarded by the body creating them, this principle does not come into play in interpreting what the record of the proceedings shows was, or was not, done. It is rather designed to test the validity of legislative action where the record shows a final action in violation or disregard of legislative rules. Here, the journal shows that the senate's consideration of the appointment was in

---

[15]Rule 4, Permanent Rules of the Senate, provides: "When nominations or appointments made by the Governor which require confirmation by the Senate have been transmitted to the Senate, the final question on every nomination shall be, 'Will the Senate advise and consent to this nomination?' which question shall not be put on the same day on which the nomination is received, nor on the day on which it may be reported by a committee unless by unanimous consent.

"Every such nomination shall, upon request of any senator, be referred to a committee, and if a question shall arise as to the proper committee, the same shall be referred without debate to the Committee on Rules and Legislative Expense to report the proper reference thereof and upon adoption of the report of such committee it shall be referred accordingly."

strict conformance with its Rule 4 to the point where the committee report was accepted.

Based upon the foregoing, in our view, the journal reveals that the senate did not discharge its constitutional and statutory right to either consent to or reject the appointment. Under this interpretation, respondent's right to continue to hold the office is subject to confirmation by the senate, and his removal without cause is possible if at a later session the senate rejected respondent's nomination and the governor nominated another for that office and such nomination was submitted to and confirmed by the senate. Whether the governor could provoke action by nominating another and thereby require the senate to choose between such nominee and respondent, who holds office by reason of an unconfirmed appointment, may raise some difficult questions. This problem, however, is not before us and should not be decided. Until respondent is removed, his superior right to the office is sufficient to require a discharge of the writ.

Writ discharged.

NELSON, JUSTICE (concurring specially).

I respectfully disagree with that portion of the majority opinion which states that the Senate Journal reveals that the senate did not discharge its constitutional and statutory right either to consent to the appointment or to reject it. The question of whether or not there was a confirmation of the appointment of respondent to the Board of Tax Appeals in the instant case is clearly before this court upon the record submitted. The problem is therefore before us and should be decided. It is clear, and the majority opinion so admits, that the appointment of respondent by Governor Andersen was complete and beyond his pleasure to revoke when reported to the senate. It is equally clear that the removal of respondent was beyond the power of Governor Rolvaag, Andersen's successor, and his appointment is irrevocable unless it was rejected by the senate.

Minnesota's procedure in filling a vacancy on the Board of Tax Appeals is one of appointment by the governor, in the first instance, and not of nomination; the appointee is not a mere nominee awaiting confirmation, but an officer duly appointed pursuant to statute and in-

vested with the powers, privileges, and responsibilities of the office to which he has been appointed, subject only to senate confirmation.

81 C. J. S., States, § 39, reads in part:

"Under provisions of the constitutions of the several states, each house generally has power to determine its rules of procedure, and in such case proceedings in conformity with the legislative rules are valid where not in conflict with the constitution; but the power of legislative houses to make their own rules is for the purpose of orderly procedure and expedition and disposition of their business, *and the failure to comply with such rules does not invalidate resolutions or legislative acts.*" (Italics supplied.)

Respondent contends that his appointment was confirmed by the state senate at the 1963 session and that the Senate Journal so indicates. He contends that the requirements of Minn. St. 271.01 with respect to confirmation were fully complied with—first, by the action taken by the senate tax committee on February 28, 1963, when it voted to recommend confirmation and, second, by the action taken by the senate as a whole when the motion to adopt the committee's report prevailed by a vote of 40 to 21.

Relator disputes this conclusion and contends that the senate failed to comply with the provisions of its own Rule 4, Permanent Rules of the Senate, which reads in part:

"When nominations or appointments made by the Governor which require confirmation by the Senate have been transmitted to the Senate, the final question on every nomination shall be, 'Will the senate advise and consent to this nomination?' which question shall not be put on the same day on which the nomination is received, nor on the day on which it may be reported by a committee unless by unanimous consent."

It is also contended by relator that since the Senate Journal fails to show the putting of the final question to the senate pursuant to Rule 4—"Will the Senate advise and consent to this nomination?"—respondent was not legally and in fact confirmed.

It has been held repeatedly by the courts of this country that the mere failure to conform to some defined parliamentary usage will

not invalidate the action when the requisite number of members have agreed on the particular measure.

The important inquiry is whether the number required by law have agreed to the particular measure. If this be so, and it is expressed in a way not inconsistent with the statutory provisions, the fact that the niceties of every parliamentary rule have not been followed does not render the act illegal. See, 4 McQuillin, Municipal Corporations (3 ed.) § 13.42; Commonwealth ex rel. Fox v. Chace, 403 Pa. 117, 168 A. (2d) 569.

Relator also contends that the word "adopt" as employed by the senate in the present context can in no way connote senate approval or ratification of the committee recommendation because confirmation in that manner bypasses the procedure envisioned in Rule 4. Nevertheless, a reading of the Senate Journal, as well as the proceedings before the senate tax committee, indicates that the words "confirm" and "adopt" were used interchangeably throughout the proceedings.

It is a well-accepted principle of law that legislative bodies are not bound by their own rules of procedure. Cases on the point are collected in 67 C. J. S., Parliamentary Law, § 3b. Such rules are created by the legislative body to insure the orderly conduct of business and the same body which makes them can also waive or simply disregard them at pleasure. See State ex rel. Fox v. Alt, 26 Mo. App. 673, and City of Sedalia v. Montgomery, 109 Mo. App. 197, 88 S. W. 1014, where the court held that legislative action is not rendered invalid because it is violative of the legislative body's own rules of procedure.

Robert's Rules of Order Revised (SF) § 54, pp. 223, 229, as well as Mason's Manual of Legislative Procedure, § 685, states that the adoption of a committee report has the effect of endorsing the statements therein and making the assembly assume responsibility for it.

In Webster's Third New International Dictionary (1961) p. 29, we find that to adopt, when used in reference to a deliberative body, means "to endorse and assume official responsibility (for a resolution of a committee)."

In Black, Law Dictionary (4 ed.) p. 70, the word "adopt" is defined as follows: "To accept, consent to, and put into effective opera-

tion; as in the case of a constitution, constitutional amendment, ordinance, or by-law," citing Real v. People, 42 N. Y. 270, 282; People ex rel. Clark v. Norton, 59 Barb. (N. Y.) 169; City of Albany v. Nix, 21 Ala. App. 164, 106 So. 199, 200. See, also, Martin v. State, 75 Ga. App. 807, 810, 44 S. E. (2d) 562, 565; and Baugh v. City of LaGrange, 161 Ga. 80, 84, 130 S. E. 69, 71.

Jefferson's Manual which, pursuant to Rule 51, Permanent Rules of the Senate, governs the procedure of the senate when applicable and not inconsistent with its rules and orders is silent as to the effect of the procedural rules of the senate on the adoption of a committee report.

Robert's Rules of Order Revised (SF) § 54, pp. 223, 229, states that the adoption or acceptance of a committee report—

"* * * has the effect of endorsing the statement and making the assembly assume the responsibility for it.

　　　*　　*　　*　　*　　*

"* * * motions to adopt, to accept, etc., are often used indiscriminately, and the adoption of any one of them has the effect of endorsing or adopting the opinions, actions, recommendations or resolutions submitted by the committee * * *."

In Commonwealth ex rel. Tarner v. Bitner, 294 Pa. 549, 144 A. 733, the court held that there is no difference between a motion and a resolution, and that it is the substance of the corporative act, and not the form, that governs.

In 1 Sutherland, Statutory Construction (3 ed.) § 604, the author has this to say with regard to the effect of a violation or disregard of rules of procedure:

"The decisions are nearly unanimous in holding that an act cannot be declared invalid for failure of a house to observe its own rules. *Courts will not inquire whether such rules have been observed in the passage of the act.*" (Italics supplied.)

In State ex rel. Lindsey v. Tollison, 100 S. C. 165, 174, 84 S. E. 819, 821, the court held:

"* * * [I]n determining what was or was not done by the Senate, the Journal must be considered as a whole, as any other record would be."

In Gray v. Childs, 115 Fla. 816, 156 So. 274, the court held:

"[The] Legislature is empowered while it is in session to make its records speak truth and to record in its journal true history of proceedings, and proceedings as written and approved by Legislature while in session are controlling data as to session's proceedings."

It is the uniform rule that parliamentary rules, such as Rule 4, are merely procedural and not substantive. They may be waived or disregarded by the legislative body, and courts have no concern with their observance.

Neither will courts invalidate an ordinance enacted in disregard of parliamentary usage if complying with statute. See, South Georgia Power Co. v. Baumann, 169 Ga. 649, 151 S. E. 513; Kerr v. Trego, 47 Pa. 292; 67 C. J. S., Parliamentary Law, §§ 3b and 6.

State ex rel. Fox v. Alt, 26 Mo. App. 673, 676, involved quo warranto proceedings to determine who was the rightful speaker of the St. Louis House of Delegates. The court said:

"The rules [of the House of Delegates] have not, in any proper sense, the force of a public law. They are merely in the nature of by-laws, prescribed for a deliberative body for the ordinary and convenient conduct of its own proceedings. The power that made them can unmake them, *or disregard them.*" (Italics supplied.)

Commonwealth ex rel. Fox v. Chace, 403 Pa. 117, 168 A. (2d) 569, was a quo warranto proceeding to determine the rightful holder of the office of councilman and the important question involved concerned the noncompliance of a legislative body with its own rules of procedure. In holding that there was substantial compliance with an applicable statute and that the appointment was valid, reflecting the will of the majority, the court said (403 Pa. 122, 168 A. [2d] 572):

"Nor is the appointment invalid because a formal resolution was not enacted. It is the substance of the act of a governing body that is all important, not the form thereof."

In the Chace case the court also pointed out that it is the members of the legislative body alone who have the right to object to the violation of its parliamentary rules and said (403 Pa. 122, 168 A. [2d] 572):

"* * * No one voiced objection to the procedure followed. Under such circumstances, the procedure may not be declared illegal by a court."

The court further made it clear that mere failure to conform to some defined parliamentary usage will not invalidate the action taken by the legislative body when the requisite number of members have agreed on the particular measure, saying (403 Pa. 119, 168 A. [2d] 571):

"The important inquiry in a matter of this nature is whether the number, as required by law, have agreed to the particular measure. If this be so, and it is expressed in a way not inconsistent with the statutory provisions, the fact that the niceties of every parliamentary rule have not been followed does not render the act illegal."

See, 4 McQuillin, Municipal Corporations (3 ed.) § 13.42; Commonwealth ex rel. v. Mayor of Lancaster, 5 Watts (Pa.) 152; and United States v. Ballin, 144 U. S. 1, 5, 12 S. Ct. 507, 509, 36 L. ed. 321, 324.

In Larsen v. City of St. Paul, 83 Minn. 473, 86 N. W. 459, it appears that the charter of the city provided that all appointments to the police force were to be made by the mayor with advice and consent of the council. This court held that no particular form of expressing the council's advice or consent was required and that it was competent for the council to express its advice and consent to plaintiff's appointment without direct action and to recognize his title to the office so that it could not thereafter be questioned. See, Madden v. Smeltz, 2 Ohio Cir. Ct. 168, 173.

In Ex parte Mayor, etc. of Albany, 23 Wend. (N. Y.) 277, the court said:

"It is no objection that in conducting the proceeding they [the city council] do not conform to by laws established by themselves to carry into effect the powers conferred upon them."

In McGraw v. Whitson, 69 Iowa 348, 28 N. W. 632, a new mayor

and some new aldermen took office between the second and third readings of an ordinance, and it was contended that the ordinance had not been properly enacted. The council had adopted for its parliamentary government Robert's Rules of Order, one of which provided that unfinished business fell to the ground when the term of service of outgoing aldermen expired. The court said (69 Iowa 350, 28 N. W. 633) that if it should concede that the rule in question became applicable, *"the most that could be said is that the council violated one of its own parliamentary rules,"* (italics supplied) and held that the violation of such a rule does not invalidate an ordinance which was passed in compliance with the statute. See, also, Mann v. City of LeMars, 109 Iowa 251, 80 N. W. 327.

In City of Sedalia ex rel. v. Scott, 104 Mo. App. 595, 609, 78 S. W. 276, 280, where it had been shown that the council had adopted Cushing's Manual to govern its parliamentary action and had not complied with its provisions in the proceedings being challenged, the court held:

"* * * [E]ven if it should be conceded that according to the sections of the Manual introduced in evidence, the council did not act on the report, the whole record shows that beyond any doubt the council did take it as a basis of its action. *But even if the council had acted out of harmony, or in contradiction of the rules of the Manual, it did no more than it legally might do, since such body is not bound to act in accordance with its rules or by-laws.* Such bodies may, and perhaps do, oftener than otherwise, waive them. [Citations omitted.]" (Italics supplied.)

Relator apparently takes the view that there was no action taken by the senate on the confirmation in the instant case. The only possible discrepancy observable is the failure of the Senate Journal to reflect compliance with Senate Rule 4 which the senate might waive or disregard so long as it complied with statutory requirements.

In Heiskell v. Mayor, etc. of Baltimore, 65 Md. 125, 4 A. 116, 57 Am. R. 308, it was held that a municipal corporation cannot, by a rule made by itself, either enlarge or diminish its own powers. Preliminary to making that decision the court said (65 Md. 149, 4 A. 118, 57 Am. R. 311):

"But these rules of procedure never contravene the statute or common law of the land. When the Constitution of the United States gave to *each house* of Congress, and the Constitution of the State of Maryland to *each house* of the General Assembly, the right to determine its rules of proceeding, it was never held for a moment that such a right included the power to change any existing statute or common law; much less can a municipal corporation claim the right under the guise of permission to frame their rules of procedure, such unlimited power. This surely must be conceded by every one; and being so conceded, the next question for us to consider is whether the right to fix a quorum, does contravene any existing law of the land."

It is therefore clear that a "rule," as distinguished from a statute or ordinance, is defined as a regulation adopted by a deliberative body for the conduct of its business and its own proceedings. Armatage v. Fisher, 74 Hun (N. Y.) 167, 172, 26 N. Y. S. 364, 367.

On the distinction between directory and mandatory requirements in statutes, and the effect of compliance or noncompliance with such requirements, see 12A Wd. & Phr. (Perm. ed.) p. 164, et seq. See, also, State, by Lord, v. Frisby, 260 Minn. 70, 108 N. W. (2d) 769.

In answering certain questions submitted by the governor about the state's election laws, the Maine Supreme Court said that requirements which are of the very essence of the thing to be done, and the ignoring of which would practically nullify the vital purpose of the statute itself, are regarded as mandatory and imperative, while those directions or details which are not of the essence of the thing to be done, but are prescribed with a view to orderly conduct, the omission of which would not prejudice the rights of interested parties, are directory unless followed by words of positive prohibition. Questions and Answers, 124 Me. 453, 468, In re Opinion of the Justices, 126 A. 354, 363.

In an early Minnesota case, State ex rel. Parker v. Smith, 22 Minn. 218, 223, this court held that, where a meeting of the council of the city of Duluth was held at which business was transacted which it only had a right to do at a legal meeting, it would be presumed, if necessary, and nothing to the contrary was shown, that all its members were present and acted. The court said:

"\* \* \* Illegality will not be presumed, but the contrary. The maxim of law in such case is, *omnia rite acta presumuntur."*

The following cases reflect the general attitude of the courts where violations of parliamentary or procedural rules have occurred in state legislative assemblies:

In Loper v. State, 82 Minn. 71, 84 N. W. 650, we construed L. 1897, c. 144, amending G. S. 1894, § 7869, with reference to its title in connection with the rules of the legislature in force at the time of its enactment. The amendment was held valid, this court stating (82 Minn. 74, 84 N. W. 651):

"Legislative enactments are not to be defeated on account of mistakes, errors, or omissions, provided the intention of the legislature can be collected from the whole statute, and the title and its history may be referred to for that purpose."

In State v. Savings Bank of New London, 79 Conn. 141, 64 A. 5, the court held that under a constitutional provision declaring that each house of the legislature shall determine the rules of its own proceedings and shall have all powers necessary for a branch of the legislature of a free and independent state, the fact that the house of representatives acted in violation of its own rules or of parliamentary law in a matter clearly within its power in the passage of a statute cannot be reviewed by the courts.

In Goodwin v. State Bd. of Administration, 212 Ala. 453, 102 So. 718, it was claimed that a statute had not been legally passed because the house when acting on it had violated one of its rules. The court, however, said (102 So. 719):

"\* \* \* counsel candidly concede that the authorities are against his contention. The rule not being required by the Constitution, but adopted by the House for its own convenience, the fact that it may have been overlooked or violated in the passage of the act did not impair its validity. [Citation omitted.]"

In Sweitzer v. Territory, 5 Okla. 297, 299, 47 P. 1094, where the defendant, convicted under a gambling law, claimed that it had not been properly passed by the legislature, the court said:

"* * * We have no constitutional provision requiring that the legislature should read a bill in any particular manner. It may, then, read or deliberate upon a bill as it sees fit, either in accordance with its own rules, or in violation thereof, or without making any rules. * * *

*"The courts cannot declare an act of the legislature void on account of noncompliance with rules of procedure made by itself to govern its deliberations."* (Italics supplied.)

The court in support of its position cited McDonald v. State, 80 Wis. 407, 50 N. W. 185; In re Ryan, 80 Wis. 414, 50 N. W. 187; State v. Brown, 33 S. C. 151, 11 S. E. 641; and Railway Co. v. Gill, 54 Ark. 101, 15 S. W. 18, 11 L. R. A. 452.

In Keenan v. Price, 68 Idaho 423, 195 P. (2d) 662, plaintiff contended that because of an error in engrossing a resolution, it had never legally passed the senate. The Idaho Constitution provided that each house when assembled should determine its own rules of proceeding, and certain rules of the senate relative to engrossing and passage of joint resolutions had not been complied with. Plaintiff contended that because of the constitutional provision, these rules had the force of law. The Supreme Court of Idaho said (68 Idaho 437, 195 P. [2d] 669):

"Plaintiff cites no authorities to support such proposition, and we do not accept it. The power of the legislative houses to make their own rules is for orderly procedure and the expedition and disposition of their business. A failure to comply with such rules does not jeopardize or invalidate resolutions or legislative acts. 59 C. J. 575. All that is required as to this constitutional amendment is contained in Article XX, Secs. 1 and 2, and a substantial compliance therewith is sufficient. [Citation omitted.]"

In State v. Cumberland Club, 136 Tenn. 84, 91, 188 S. W. 583, 585, the court said:

"So far as concerns the violation of its own rules by the Senate, this cannot furnish a basis for the court's annulment of an act. The Senate has the right, under the constitution to make its own rules (Const. art. 2, section 12), and it must be the judge of those rules. All the court can do is to ascertain whether the constitution has been complied

with. If this has been done, we cannot look further. The same question has arisen in other states, and has been decided in the same way."

In Railway Co. v. Gill, 54 Ark. 101, 105, 15 S. W. 18, 19, 11 L. R. A. 452, affirmed, 156 U. S. 649, 15 S. Ct. 484, 39 L. ed. 567, the court held that:

"* * * The joint rules of the general assembly were creatures of its own, to be maintained and enforced, rescinded, suspended, or amended, as it might deem proper. Their observance was a matter entirely subject to legislative control and discretion, not subject to be reviewed by the courts."

In McDonald v. State, 80 Wis. 407, 50 N. W. 185, the Wisconsin Supreme Court held that the courts will take judicial notice of the contents of the journals of the two houses of the legislature far enough to determine whether an act published as a law was actually passed in accordance with constitutional requirements but will not inquire whether the two houses have or have not complied strictly with their own rules in their procedure upon the bill between its introduction and final passage. The court said (80 Wis. 412, 50 N. W. 186):

"* * * Further than this the courts will not go. When it appears that an act was so passed, no inquiry will be permitted to ascertain whether the two houses have or have not complied strictly with their own rules in their procedure upon the bill, intermediate its introduction and final passage. *The presumption is conclusive that they have done so. We think no court has ever declared an act of the legislature void for non-compliance with the rules of procedure made by itself, or the respective branches thereof, and which it or they may change or suspend at will.* If there are any such adjudications, we decline to follow them." (Italics supplied.)

The fact that Rule 4 was not, in so far as the Senate Journal records, observed by the senate will not of itself invalidate a confirmation made by the senate if it is demonstrated that, although disregarding its own rule, the senate nevertheless agreed in adopting the report of the tax committee recommending the confirmation of respondent's appointment.

As has been suggested by the court in Commonwealth ex rel. v. Mayor of Lancaster, 5 Watts (Pa.) 152, the rule in the instant case was virtually repealed for the occasion when its authority was disregarded by those who had the power to control it, and the act of breaking through it, if not an abrogation, was at least a suspension of it. There is nothing in the Journal of the Senate indicating that anyone voiced objection to the procedure followed.

When, as stated in 62 C. J. S., Municipal Corporations, § 403, the mode of voting is not prescribed by statutory or charter provisions, any reasonable mode may be adopted which is not forbidden by law, which insures to each member the right to vote, and by which the will of the majority can be fairly ascertained. All who voted in the tax committee and all who later voted on the motion put to the senate to adopt the report were legally constituted officials and the action taken by them ought not now, under the circumstances, be ruled out because there is nothing to indicate a compliance with the senate procedural, parliamentary rule which is without force of law, statutory sanction, or invalidating power under any rational view of the applicable law of this state.

I am therefore of the opinion that the senate, as a whole, agreed to the committee report recommending confirmation of respondent's appointment to the Board of Tax Appeals when the motion to adopt the report prevailed, as indicated by the journal. There is no merit in relator's contention that the senate failed to confirm simply because its journal does not show compliance with one of its own procedural rules. The clear manifestation of consent shown by the action taken is conduct from which in the light of the circumstances it is reasonable for others to infer consent. The present proceedings to confirm, as shown by the journal, must, without regard to Rule 4, stand as proof conclusive of confirmation according to all constitutional and statutory legal requirements. See, McDonald v. State, *supra.*

It should therefore be ordered that the writ of quo warranto should be discharged on the ground that respondent's appointment has been confirmed by the senate and is beyond the pleasure of the governor to revoke.

KNUTSON, CHIEF JUSTICE (concurring specially).
I agree with the opinion of Mr. Justice Nelson.

MR. JUSTICE SHERAN took no part in the consideration or decision of this case.